HENRY KRAMER *v.* THE CLEVELAND AND PITTSBURGH RAIL-
ROAD COMPANY.

In proceedings for the appropriation of private property to public uses, arising
under the constitution of 1802, the construction put upon that instrument
by the Supreme Court, that it allowed the benefits conferred to be deducted
from the value of the property appropriated, and that it did not require the
assessment to be made in a court, or by a jury, will be adhered to by this
court.

Three disinterested freeholders of the county where the property is situated,
appointed by a judge of a court of record, was a competent tribunal to
make the assessment.

Where notice was actually given, and the owner appeared before the apprais-
ers, the proceeding cannot be invalidated, for the reason that the law pro-
vided for no such notice.

IN CASE. Reserved in the District Court of Cuyahoga county.

The defendant entered upon and dug down the lands of the
plaintiff, and carried away gravel and sand therefrom; and con-
structed its railroad through and over said lands, and caused said
lands to be appropriated to the uses of such railroad.

The plaintiff sued the defendant in the court below for damages
for so doing.

The defendant claims to be justified in its acts, by virtue of the
provisions of the 8th section of the act of Feb. 16, 1849, (47
O. L. 149,) " authorizing the city of Cleveland to subscribe to
the capital stock of the Cleveland and Pittsburgh Railroad Com-
pany, and for other purposes." The section is in the following
words:

" SEC. 8. That the president and directors of said company, or
a majority of them, or any person authorized by them, or a ma-
jority of them, may agree with the owner or owners of any land,
earth, timber, gravel or stone, or other materials, or any imple-
ments which may be wanted for the construction or repair of said
road, or any of their works, for the purchase, or use, or occupation
of the same; and if they cannot agree, or if the owner or owners,
or any of them, be a married woman, infant, insane person, or
idiot, or out of the county in which the property wanted may lie,

when such land or materials may be wanted, application may be made to the court of common pleas, or other court of record of the county where the land lies, or any judge thereof in vacation, by either party, and said court or judge shall appoint by warrant, three disinterested freeholders of such county, to appraise the damages which the owner of the land may sustain by such appropriation. Such appraisers shall be duly sworn; they shall consider the benefit as well as the injury which such owner shall sustain by reason of said railroad, and shall forthwith return their assessment of damages to the clerk of said court, setting forth the value of the property taken, or damage done to the property; the amount of benefit conferred, and the difference between the value of, or the damage done to, the property taken, which they assess to such owner or owners separately, to be by him filed and recorded; and thereupon said railroad company shall pay to said clerk the amount thus assessed, or secure the payment to the satisfaction of said court, or the judge issuing the warrant. And on making payment or tender thereof to said clerk, or on giving such security as may be required, it shall be lawful for said company to hold their interests in such lands or materials thus appropriated, and the privilege of using any material on said road-way within fifty feet on each side of the center of such road-way for the uses aforesaid; the costs of such award to be paid by said company, and on motion of any party interested."

The special plea of justification sets up proceedings in conformity with this section of the statute, alleging, in substance, that the plaintiff had notice of the appointment of the appraisers, and that he appeared before them at the time and place the appraisement was made; that in the return of their assessment of damages to the clerk of the court, they estimated the value of, or damages done to, the property, taken at six hundred and fifty dollars, and the amount of benefit conferred at four hundred dollars, and the difference at two hundred and fifty dollars; and that the amount thus assessed, to wit: two hundred and fifty dollars, was paid to the clerk by the defendant, for the use of the plaintiff.

The plaintiff demurred to this plea, and the questions thus raised were reserved for decision by this court.

*Bolton, Kelley & Griswold*, for plaintiff:

The plaintiff claims that the 8th section of the statute under which the defendant justifies was unconstitutional and void, and therefore furnishes no justification to the defendant.

1. It is unconstitutional, because it allows benefits conferred to be set off against the value of the land appropriated by the defendant, in making compensation to the owner thereof, — not only " accidental " benefits which happen by reason of the public work to the balance of the land remaining unappropriated, but also " general benefits," or those which the owner of the land appropriated receives in common with others. See *Cooper* v. *Williams*, 4 Ohio Rep. 253. The case of *Symonds* v. *The City of Cincinnati*, 14 Ohio Rep. 147, allows " accidental benefits " only ; but the principle established in that case does not cover and embrace the section under which the defendant justifies, because that section includes both " general and accidental benefits," as well as benefits which might arise or occur to his peculiar business or employment—indeed any benefits which the vivid imagination of the appraiser might suggest.

2. This 8th section of said act is unconstitutional, because it fails to afford just compensation to the owner of land appropriated, in not providing a proper tribunal to assess the damages sustained. It is well settled, unless compensation is made to the owner of private property which is taken for public use, any act authorizing such appropriation is void. It seems equally clear that, although compensation is proposed, yet if by design or accident, the legislature fails to provide just compensation, such act is also void. *Gardner* v. *The City of Newburgh*, 2 Johns. Ch. Rep. 162 ; Kent Com., vol. 2, 5th ed., sec. 339, notes.

This 8th section, under which the defendant justifies, is entirely wanting in those requisites which justify the appropriation of private property to public use.

The appraisers provided in this section are in no sense a " tribunal before whom each party may meet and discuss their claims

on equal terms." They are appointed at the instance of the corporation. No notice is required to be given, either of their appointment, or of the time when the assessment shall be made. The owner of the land cannot appear before them to discuss or prefer his claims. He has no opportunity to offer testimony ; nor are they required to hear him or his counsel, should he be so lucky as to hear of their appointment. No appeal can be taken from their decision. There is no correction for their errors, and no punishment for their corruption.

This board of appraisers possesses no attribute whatever of a fair and equitable tribunal. They may be appointed in vacation, on the same day view the land appropriated, adjudge the "benefits" equal to the damage done, and the same day make return to the clerk of the court appointing them, and, without notice, the property of the unfortunate owner is divested from him, and vested in the Cleveland and Pittsburgh Rail Road Company. The allegation in the plea, that the plaintiff had notice of the assessment by the committee, and met with them, does not aid the *act.* The notice was of no avail to the plaintiff. This board of appraisers were under no obligations to hear him, nor were they required or directed to give him a hearing. This notice was only an aggravation to the injury that was done to him. This law, under which the defendant justifies, is opposed to the whole current of Ohio legislation. Besides this, and two other acts, we believe the General Assembly have never granted to any company or corporation such absolute power.

No decision of the Supreme Court has ever gone so far as to sustain such an ex parte proceeding as this 8th section provides for. On the other hand, our judges have uniformly sustained and been governed by the rule laid down by Chancellor Kent.

*Cooper et al.* v. *Bates,* 4 Ohio 284 ; *Bates* v. *Cooper,* 5 Ohio 115 ; *McArthur* v. *Kelly,* 5 Ohio 139 ; *Willyard* v. *Hamilton,* 7 Ohio, 2d Pt., 111 ; *Foote* v. *The City of Cincinnati,* 11 Ohio 408 ; *Symmonds & Symmonds* v. *Same,* 14 Ohio 147.

In all these cases, the court has justified the taking of private property for public use, in addition to the necessities of the public welfare, on the ground that an adequate compensation was paid

to the owner, and that a fair and equitable tribunal was furnished him to assess that compensation.

*Foote & Newton*, and *Williams & Cary*, for defendant.
The Reporter finds no brief on behalf of defendant.

RANNEY, J.  The defendant justifies under the provisions of the 8th section of the act of February 16, 1849, to authorize the city of Cleveland to subscribe to the capital stock of the Cleveland and Pittsburgh Railroad Company, and for other purposes.　47 O. L. 149.　That section empowered the company to agree with the owners of land, etc., needed for the construction or repair of their road, for the purchase, or use, or occupation of the same; or, if they could not agree, or if any of the owners were married women, infants, or insane persons, or out of the county in which the land, etc., was situated, either party might apply to any court of record of the county in which the land lay, or to any judge thereof in vacation, whose duty it was to appoint by warrant three disinterested freeholders of the county, to appraise the damages which the owner of the land might sustain by the appropriation; who, upon oath, were required to consider the benefit as well as the injury which such owner would sustain by reason of said railroad, and forthwith return their assessment of damages to the clerk of the court, setting forth the value of the property taken, or damage done to the property, the amount of benefit conferred, and the difference assessed to the owner.　This award the clerk was required to file and record; and the company, on paying or tendering the amount, or securing the payment to the satisfaction of the court or judge issuing the warrant, was authorized to hold the property for the uses and purposes for which the same was appropriated.

The special plea of the defendant sets up regular proceedings instituted by the company under this section, alleging notice to the plaintiff of the appointment of appraisers, and his appearance before them, and full payment of the damages awarded.

The demurrer to this plea draws in question the constitutionality of the section referred to; and, in the argument, it is claimed to

be repugnant to the constitution of 1802, under which it was enacted, and under which these proceedings were had, because, 1st, It allows benefits conferred to be set off against the value of the land appropriated, in making compensation to the owner ; and because, 2d, It fails to afford just compensation to the owner of land appropriated, in not providing a proper tribunal to assess the damages sustained.

In both these particulars, which are pressed upon our attention with earnestness and ability, it is said to violate the 4th section of the 8th article of that instrument, which provided that " Private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation be made in money to the owner."

So far as this argument proceeds upon general principles, it is impossible not to see, that it involves a repudiation of repeated decisions made by the court of last resort, sitting under that constitution, and treats as open, questions which those decisions were intended to settle and close. In the case of *Symonds* v. *The City of Cincinnati*, 14 O. R. 147, which was very fully argued and maturely considered, the direct question was presented, " whether the defendants could set off against the value of the plaintiff's property, appropriated for public uses, any increased benefit, arising from the improvements made by the city to the balance of the lot ?" And it was held, that such deduction could properly be allowed. The opinion proceeds upon the ground, that the constitution only requires *compensation* to be made, and that it is made when the party receives in money the difference between the value of his property before, and what remains after, the work is constructed.

In *Willyard* v. *Hamilton*, 7 O. R. 111, pt. 2d, the position was taken, that the owner was entitled to have the value of his property fixed by a jury, and that the legislature could not compel its assessment by commissioners. But the court were of a different opinion, and very conclusively show that the proceeding neither belonged to a court of justice, nor was it one of the cases in which a jury trial was guaranteed by the constitution. Whatever of doubt there might have been about these questions orig-

inally, we are not disposed, at this late day, and after that constitution has ceased to exist, to depart from a construction which was universally acted upon by the legislative and judicial departments of the government, while it was in force. For myself, I am free to acknowledge, that I should have adopted a different rule of compensation, and should have held the owner entitled to the fair cash value of the property taken, without any regard to the effect of the improvement upon his other property. But I am bound to admit, that some strong reasons may be given for the rule adopted, and it certainly has much of judicial support in other States; while I do not consider it my duty to interpose my individual opinion against such a weight of authority, when it is certain to open up a multitude of controversies, not only where lands have been appropriated by corporations for turnpikes, railroads, etc., but in respect to all the public roads and canals of the State. It seems much more in accordance with a sound public policy, to adopt the construction uniformly acted upon by those who lived under and administered that instrument; especially in view of the fact, that all cause of complaint has been removed by the present constitution.

Upon the questions presented in the other case, I do not see much room for doubt. Whatever may be the theoretical foundation of the right of eminent domain, it is certain that it attaches as an incident to every sovereignty, and constitutes a condition upon which all property is holden. When the public necessity requires it, private rights to property must yield to this paramount right of the sovereign power. We have repeatedly held that the character of the work for which the property is taken, and not the means or agencies employed for its construction, determines the question of power in the exercise of this right. It requires no judicial condemnation to subject private property to public uses. Like the power to tax, it resides with the legislative department, to whom the delegation is made. It may be exercised directly or indirectly by that body; and it can only be restrained by the judiciary when its limits have been exceeded, or its authority has been abused or perverted. But the constitution has fixed an indispensable condition to its exercise. Full

compensation must be made to the owner, before the property can be taken.  A fair and equitable mode for ascertaining the amount of this compensation, and an undoubted fund from which to pay it, must in all cases be provided, as a necessary part of the proceeding to appropriate.  *Foote* v. *City of Cincinnati*, 11 O. R. 408.

We see nothing in the law now drawn in question to distinguish it from those already sustained, so far as the rule of compensation is concerned.  An impartial tribunal is certainly provided for ascertaining it.  It must consist of three *disinterested* freeholders of the county, selected by an impartial judicial tribunal, at the instance of either of the parties.  They must act under oath, and upon actual view of the property appropriated.  If any of these are wanting, their action is unavailing.  It might have been more judicious to have provided for reviewing their determination.  But this was a matter of legislative discretion, not to be revised by the judiciary.

It was certainly important that the adverse party should have notice of the action of the appraisers, in order that he might point out to them such circumstances as were calculated to enhance the value of the property, or the damages sustained.  But, allowing this to have been indispensable, it is averred that he had such notice, and did actually appear before the appraisers.  Where this is done, we do not think the omission in the act to require it, can be made use of to invalidate the proceeding.  It is no part of the duty of the appraisers to hear evidence or arguments.  This has never been required in any of our laws, prior to the adoption of the present constitution.  They proceed upon actual view of the property taken or injured, and from the information thus derived, make the appraisal or assessment.  We think the plea sufficient; and the demurrer must therefore be overruled, and the cause remanded for further proceedings.

BARTLEY, J., dissenting:

I cannot concur in the judgment just announced, and the importance of the question involved makes it proper to state the grounds of my dissent.

It appears to be conceded, that too loose a construction of the constitutional guaranty of the right of private property has heretofore prevailed, in reference to the exercise of the right of eminent domain by private corporations ; yet, as I humbly conceive, no decision of the court of last resort in this State has ever before gone in that direction, to the extent to which this decision goes. And, with all due deference for the opinion of the majority of the court, I must say, that in the view I take of this case, the decision not only carries a dangerous doctrine to an extent which is unsustained by either principle or judicial precedent, but which perpetuates a latitudinarian rule of construction, which will not cease with the operation of the former constitution, but continue as a landmark to be followed in analogous cases under the new constitution.

The protection of the right of private property is one of the most important objects of civil government. The right of *eminent domain,* to which the right of property is made incidentally subservient, is one of the highest attributes of sovereignty conferred upon the State. It was at one time contended, with great force and plausibility, that this function of the civil power could only be exercised by the government, and that the exercise of it could not be delegated to individuals or private corporations, any more than the coördinate power of taxation, or power of enacting and repealing laws. *Beekman* v. *The Saratoga and Schenectady Railroad Company,* 3 Paige's Rep. 45. Although I am not disposed, at this day, to question the delegation of this power to private corporations, (even although for the construction of works which are *private property, and controlled and used as such,*) sustained upon the ground of a resulting benefit or advantage to the public ; yet I insist, that if there be any matter of truth or value in the settled rules of judicial interpretation, the constitutional grant of this power must be *strictly construed ;* and that such exercise of it by private corporations, which always is upon occasion, not of *public emergency*, but simply of *public convenience,* should be well guarded against infringements of the rights of private property.

In reference to the constitutional provision that private property

shall not be taken for public use without just compensation, Judge Story said : " This is an affirmance-of a great doctrine, established by the common law, for the protection of private property. It is founded on natural equity ; and is laid down by jurists as *a principle of universal law.*" 3 Story's Com. 661. Kent, Wilson, Rawle, and other commentators on American law, declare the same doctrine. Grotius, Puffendorf, and other eminent authors on the fundamental principles of the law, have laid down the rule with equal, if not greater stringency. Blackstone on this subject says :

" So great, moreover, is the regard of the law for private property, that it will not authorize the least violation of it ; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might, perhaps, be extensively beneficial to the public ; but the law permits no man, or set of men, to do this without consent of the owner of the land. In vain may it be urged that the good of the individual ought to yield to that of the community ; for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modeled by the municipal law. In this and similar cases, the legislature alone can, and indeed frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him *a full indemnification* for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price ; and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform."

This view of the importance of the great principle involved in the constitutional guaranty of the right of private property, should be borne in mind in the consideration of the case before us.

The plaintiff sued the defendant in this case, for seizing and appropriating a part of his lands to the purposes of the company in the construction of its railway. The *legality* of the appropriation depends on *the constitutional validity* of the statute under which the defendant took the plaintiff's property. And the constitutionality of this statute is involved in the following inquiries, to wit :

1st. Whether the legislature had the power to authorize the defendant, in the construction of its railway, *to take and hold* the plaintiff's land, upon either " paying *to the clerk of the court* the amount assessed," or, at its option, simply *securing the payment thereof* to the satisfaction of the court or judge before whom the proceedings for the appropriation were instituted, instead of paying to the plaintiff a *compensation in money.*

2d. Whether the condition of making *compensation in money to the owner*, upon which alone the constitution authorized private property to be made " subservient to the public welfare," was complied with by the statutory provision authorizing the compensation to be made, in the *prospective* or *speculative benefit* which the owner might realize by reason of the railroad ; or partly in such benefits, and partly in money, either paid or *secured to be paid.*   And

3d. Whether the legislature could, consistently with the constitutional guaranty of the right of private property, so delegate the right of eminent domain to the defendant as to authorize the company, in the *simple exercise* of its own *pleasure* or *judgment, without notice to the plaintiff*, and without affording him an opportunity to invoke the exercise of the judicial power of the State, as to either *the necessity* of the appropriation, or *the fair assessment of the compensation*, to take, appropriate, and forever hold, the plaintiff's land.

These questions, which will be considered in their order, fairly arise upon the statutory provision, upon the authority of which the defendant took the plaintiff's property, and which is as follows :

" SEC. 8.   That the president and directors of said company, or a majority of them, may agree with the owner or owners of any land, earth, timber, gravel or stone, or any implements which may be wanted for the construction or repairs of said road, or any of their works, for the purchase, or use, or occupation of the same ; and if they cannot agree, or if the owners or any of them be a married woman, infant, insane person, or idiot, or out of the county in which the property wanted may lie, when such land or materials may be wanted, application may be made to the court of common pleas, or other court of the county where the land lies, or any judge thereof in vacation, by either party, and said court or judge shall appoint, by warrant, *three disinterested freeholders of such county*, to appraise the damages which the owner of the land may

Kramer *v.* The Cleveland & Pittsburgh Railroad Company.

sustain by such appropriation. Such appraisers shall be duly sworn; *they shall consider the benefit as well as the injury which such owner shall sustain by reason of said railroad,* and shall *forthwith return* their assessment of damages *to the clerk of said court,* setting forth the value of the property taken, or damage done to the property; the amount of benefit conferred, and the difference between that and the value of, or the damage done to the property taken which they assess to such owner or owners separately, to be by him filed and recorded; *and thereupon* said railroad company shall pay to said clerk the amount thus assessed, *or secure the payment to the satisfaction of* said court, or the judge issuing the warrant. And on making payment or tender thereof to said clerk, OR ON GIVING SUCH SECURITY as may be required, it shall be lawful for said company TO HOLD THE INTERESTS IN SUCH LANDS OR MATERIALS THUS APPROPRIATED, and the privilege of using any material on said road-way within fifty feet on each side of the center of such road-way for the uses aforesaid; the costs of such award to be paid by said company, and on motion of any party interested." Ohio Laws, Vol. 47, page 149.

1st. It is no answer to the first inquiry to say, that the company did not avail itself of the alternative provision of this law, by *giving the security* for compensation to be paid to the owner, but actually paid the amount awarded to *the clerk of the court.* The inquiry is not what was done by the party, but whether the law is inconsistent with the constitution. The provision giving the company the option, instead of paying the amount assessed, to give security for its future payment to the satisfaction of the judge, is essentially connected with, and a material part of, the provision prescribing the terms and conditions on which the appropriation was authorized. This is not the case of a distinct, independent, and disconnected provision of a statute, which might be rejected as unconstitutional, and leave the other part of the law, in its context, perfect and complete in its essential conditions, as enacted by the legislature. It is not the province of the judicial power to amend statutes by rejecting as unconstitutional and void one clause of a sentence in a statute containing a material and connected alternative provision, as one of the modes or terms on which the act prescribed may be done, leaving the balance of the same provision to stand. Such an unconstitutional clause vitiates the whole statutory provision with which it is connected, and of which it constitutes a material ingredient.

The constitution declares that, "private property should ever be held inviolate, but subservient to the public welfare," *on one*

*only condition,* to wit: "*provided a compensation in money be made to the owner.*" The payment of this compensation is made a *condition precedent.* The right of property in the land could not, by the express terms of the constitution, pass to the corporation, until the compensation be actually made, or at least a tender thereof made to *the owner.* And the compensation must be made or tendered to *the owner,* and not to the clerk of the court, or any other person than the owner. And it must be made *in money,* and not in a note with security to the satisfaction of any judge or court. And under the provisions of this law, who was to fix the terms and the time of payment, when the security was given to the satisfaction of the judge? Would the amount have to be made payable on demand, or could it be made payable at a future period, and by installments? Would it draw interest, or could it be made payable without interest? In the absence of all other provisions touching its terms, would not the judge, or court, to whose satisfaction the security had to be given, have the power to fix the time and the terms of payment. And suppose the security given to the satisfaction of the court, or judge, should, by some egregious mistake, turn out to be good for nothing; or suppose that, by a turn of the wheel of fortune, the surety should fail, and become insolvent, and the company break up, before the owner had any knowledge of the appropriation, or any opportunity of calling for his money, according to the provisions of this law, the company would " hold " the land, although, in sober truth and reality, no compensation ever had been, or ever would be made to the owner, in money or any thing else.

And why is it that this law contains no provision whatever requiring the amount assessed on account of the appropriation, to be *paid or tendered to the owner?* It simply provides for payment to the clerk of the court, or security for the payment to be given. Now, this statute no where requires any notice to be given to the owner of the land, either of the appropriation made by the company, or of the proceedings for the assessment of the damages. The express terms of this law would allow the company to determine on the appropriation, apply to the judge, and procure the

*three disinterested freeholders* to be appointed, and have them appraise the damages, and return their assessment to the clerk of the court, weeks, perhaps months, before the owner would have any knowledge that he was to be disturbed in the possession of his land. The law not only allows, but authorizes this to be done. And suppose it to be done, and that the company, on the return of the assessment by the appraisers, pays over to the clerk the amount, and before the owner of the land gets any information of the proceedings, the clerk breaks up, or absconds with the money, and his bond of no validity, or his sureties insolvent, according to the terms of this law the company would " hold " the land forever, and the owner might whistle for his compensation or damages. For he could not charge the company with a fraud, in doing what the law expressly authorized. And if the law be valid, he could not sue the company and compel it to pay the amount the second time; for the appropriation, assessment of the damages and payment by the company, according to the terms of the law, would be an ample defense against any proceedings which the owner could have resort to. Can the constitutional guaranty of the right of private property be thus evaded by legislation ? If this law be valid, it can. The constitutional provision is plain, distinct, unequivocal. *Compensation in money* made to the owner, is the only condition upon which the property could be subjected. There can be no equivalent for this, unless it be a tender of the amount in money to the owner. Neither the payment of the amount assessed, to the clerk of the court, nor the security for such payment to the satisfaction of the judge, without either the knowledge, or the consent of the owner, can be made a substitute for the condition required by the positive requirement of the constitution. The statute provides that the company may take and hold the land on paying to the clerk, or securing to be paid, the amount awarded. The constitution prohibits the taking of property except on payment of the amount *in money to the owner*. This statute, therefore, in express terms, provides for doing what the constitution has plainly, and in express language, prohibited.

2d. This statute requires the appraisers to estimate the *benefit*

conferred upon the owner by reason of the railroad, as well as the value of the land taken, or damage done to the property ; *and the only amount required to be paid* to the owner is *the difference* between the value of the property taken, or amount of damage done to the property, and the benefits conferred.    The *benefits* required to be taken into the estimate, are, of course, *prospective* benefits, and they are not limited to *incidental* and *local* benefits to adjacent lands of the owner, but the *general benefits*, as well as the incidental, conferred on the owner by reason of the railroad, whether they relate to lands adjacent to the land taken, or other lands disconnected therewith, or other property of the owner, or his business.    Such is the effect of the language of the statute.    There is no limitation or restriction expressed. The benefit to be estimated is the benefit generally conferred on the owner by reason of the railroad.    And the plea of the defendant, upon which the question arises, avers that the appraisers " assessed the amount of *the benefit conferred on the owner by reason of the said railroad,*" etc.    It is not even pretended that the amount of the benefits assessed by the appraisers in this case was incidental and peculiar to the plaintiff's land.    It must be conceded that the only benefits considered by the appraisers were *general and prospective benefits*.    And the question presented is, whether, under the authority of the constitution, *prospective benefits* generally, whether incident to lands connected with the land taken, or other lands or property of the owner, or his business, can be taken into the account, and set off against the value of the property taken, in ascertaining the compensation to be paid to the owner.    If this can be done, the law is constitutional in this respect ; if not, then it has no binding authority.

The undeniable effect of this statute is, that, if the appraisers should find by their estimate and assessment, that the benefit conferred exceeded, or was equal to, the value of the property taken or damage done, the owner would not be entitled to, and could not receive, any compensation other than such prospective benefit.    If he could be entitled to any other compensation, it would be by virtue of some other authority than the authority of this statute.

The language of the constitution under which this law was enacted is as follows :

" *Private property ought, and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation in money be made to the owner.*"

This provision in the bill of rights declares : 1st, The inviolability of the right of private property ; 2d, Its incident of liability to be made subservient to the public welfare ; 3d, *The condition* of this liability to the public use. The only condition on which the exercise of the right of eminent domain can, in any event, be delegated to private corporations, is here expressed. The condition is *compensation to the owner;* the prescribed form for the performance of the condition, *payment in money.* What is it that is to be paid for in money ? *The property,* of course, which is made subservient to the public welfare. How can the owner be compensated for his property *in money,* unless the *value* of his property taken be paid him *in money?* Compensation is the rendering *an equivalent in value or amount,* according to all standard lexicographers. To compensate a person in money for an article of property obtained from him, is to pay him its value in money. The language of the constitution is plain, clear, positive, leaving no ground for interpretation or cavil. And there is no ambiguity in its context, subject matter, or manifest intent, which can leave even a fair pretext for judicial construction.

The constitution, therefore, provided for compensation in money to the owner, as the condition, and the only condition, on which private property could be taken for the public use. But this statute provided that this railroad company might take private property for the purposes of its railway, on the ground of its being for the public *convenience,* and pay the owner, either in whole or in part, in the prospective benefits which its road might be expected to confer. The constitution made a compensation in money essential. This statute dispenses with that troublesome condition prescribed by the constitution, and permits the company to take property, and pay for it in estimates made of anticipated benefits. In the case before us, the plaintiff's property taken was estimated at $650, the anticipated benefit at $400. So that for property

valued at $650, the compensation allowed, was, in *anticipated benefits*, $400 ; *in money*, $250.   Is this a compliance with the positive language of the constitution, requiring an equivalent in money ?

It is material to consider the *time when* the constitution requires the compensation to be made.   By the language used, the payment of the compensation is made a condition *precedent*, or, at least, *concurrent* with the act of taking the property.   The legislature could not, certainly, make the payment a condition *subsequent* to passing the interest in the land to the company, without violating the plain language and manifest intent of the constitution.   Upon this subject, Chancellor Kent, in his Commentaries, vol. 2, 339, says:   " A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent ; and this principle in American constitutional jurisprudence is founded on natural equity, and is laid down by jurists as an acknowledged principle of universal law."   Grotius De Jure B. & P., b. 3, c. 19, sec. 7 ; ch. 20, sec. 7.   Puff. De Jure Nat. et Gent., b. 8, ch. 5, secs. 3–7.   And in a note on the same page, the learned commentator has added :

" The better opinion is, that the compensation, or offer of it, must precede or be concurrent with the seizure and entry upon private property under the authority of the State.   *   *   *   The *civil code of Louisiana*, Art. 489, had declared that there must be the *previous* indemnity, and so did *the code Napoleon*, Art. 545, and the constitutional *charter of Louis XVIIIth*.   The provision in our American constitutions is essentially the same, though not in the same words precisely, and it would seem to require the same construction.   Several of them declare that private property shall not be taken for public use *without full compensation being made.*   The settled and fundamental doctrine is, that government has no *right* to take private property for public purposes without giving a *just compensation ;* and it seems to be necessarily implied, that the indemnity should, in cases which will admit of it, be *previously* and *equitably* ascertained, and be ready for reception concurrently in point of time with the actual exercise of the right of eminent domain.   This point was ably discussed in *Thompson* v. *Grand Gulf Railroad and Banking Co.*, 3 Howard 240, and the decision was, that the compensation must precede the seizure of private property for public uses."   *Stacy* v. *Vermont Cent. Railway Co.*, 27 Verm. R. 39.

Now, take this, which Kent says, is " an acknowledged principle of universal law," and which is in strict accordance with

the plain and direct language of our State constitution, and let the test be applied to the statute under consideration. Does this statute provide for *previous* indemnity or compensation to the owner? The great principle of universal law, as well as the constitution, requires the *previous* payment, not of *a part*, but of *the whole* of the indemnity or compensation, before the property can be taken—before the right can pass—before the company can take and " *hold their interests in such lands.*" . If, in accordance with the constitution, the company could pay the indemnity or compensation, either in whole or in part, in benefits resulting to the owner from the railway, when would the owner receive it? The property is taken when the company first commences the construction of its road. In the ordinary mode of building railways, in this country at least, it is several years after the company takes and appropriates the land for its right of way, before the completion of the work, so as to confer any benefit on persons interested. In the case before us, nearly two-thirds of the estimated value of the plaintiff's land taken, was, by the provisions of this law, to be paid for in the benefit to result to him from the railway. The company, therefore, would appropriate and take the land several years before the plaintiff could receive any thing on about two-thirds of the value of his property taken. And if the appraisers, in this instance, had estimated the benefit to the plaintiff at $650, or more, instead of the $400; or in other words, had they found the benefit equal to, or more than, the estimated value of the property taken, then by the terms of this law, the plaintiff could have received no *previous* indemnity or compensation, but would have to allow his property to be taken, and to wait several years for the completion of the road, before he could even *expect* to receive any compensation for his property. And suppose that after the completion of the railway, it should turn out, as it often has in this country, that the appraisers were wholly mistaken as to the anticipated benefit to the owner, and that instead of being benefited, he was in fact injured, and that his other property would not sell for as much as it would have brought before the construction of the road, what would be the

result ? By virtue of this statute, the owner would be robbed of his property under the mere semblance of authority, without compensation for it in money or anything else, and without a remedy for his wrong.

The flagrant injustice and gross absurdity of the ideal compensation or indemnity, in prospective and speculative benefits, is shown by tracing the transaction to its ultimate results. The construction of a railway or other public improvement, is usually, if not universally, commenced with high-blown and exaggerated ideas among the people in the region of country in which it is located, in regard to the anticipated benefits to result from it, both public and private. Every freeholder in the county more or less takes a personal interest in it, expects his property to be made more valuable, his business more enlarged and profitable, and therefore feels a personal interest in favoring and encouraging the work. Exaggerated calculations are made and fanciful pictures drawn of the resulting benefits. Under such circumstances, to call in "three *disinterested* freeholders of the county" to assess the value of property taken, and compensate the owners in imaginary future resulting benefits, is a mere mockery of justice ! Nay, worse ! It shows that not only the plainly expressed declaration in the bill of rights, but the acknowledged principles of universal law, furnish little else than a sham protection against the struggles of cupidity when the spirit of public aggrandizement is abroad.

At the commencement of the construction of a railroad, and when the company makes its appropriation and takes the land for its right of way, it is impossible for any person to know, and be able to estimate with any kind of certainty or accuracy, what benefit the railroad, when completed, may confer on any particular adjacent land proprietor. The market value of land and other property depends on a great variety of circumstances, and very frequently sells for less price after the construction of a railroad in its vicinity, than it did before. Besides, it is a violation of a fundamental principle, to compel a person to take and pay for a thing against *his consent*. The dominion of proprietorship implies the right of the owner to appropriate and use his own prop-

erty as he may choose ; and property cannot be given to a man against his consent.  On the plea of *public necessity or convenience* private property may be taken from a man on the condition mentioned, against his consent ; but property cannot be given to him against his consent.  It follows that a person cannot be compelled to purchase and pay for reflected benefits against his consent, and which, in the use he may wish to make of his own property, may be of no manner of value to him.  If the government, or a private corporation, when it constructs a public work, can justly charge every person holding property in the vicinity of it, with the supposed prospective resulting benefit conferred on such person according to the estimate of three freeholders of the county, appointed at the instance of the agents of the State or corporation, it might be made to furnish a very convenient and extensive source of revenue.  But would it be any more just, than to allow a private individual, who builds a valuable house for a hotel or other public business, to bring a charge against his neighbors and compel them severally to pay him for the benefit he has conferred on each ?

It is sometimes urged, with an appearance of plausibility, that the compensation required by the constitution is not a compensation for the value of the property taken, but a compensation for the wrong or injury done the owner ; and that, to ascertain the extent of the injury done, the damages occasioned by the taking of the property may be reduced to the extent of the benefit conferred.  The merit of this argument consists solely in ingenuity of statement.  It is simply a change in words or the form of stating the same thing.  The result is the same, whether the matter be expressed by the words, compensation for the property taken, or compensation for the damages occasioned by taking the property.  In the one instance, compensation is reduced by setting off benefits against damages, and in the other, by setting off benefits against the value of the property ; but it all amounts to the same thing at last, unless by a confusion of ideas damages and benefits be confounded.  It must be borne in mind that the damages and benefits are separate and distinct things.  It is not the taking of the owner's property that confers the benefit.  On the

contrary, that occasions the damage or injury. The benefits result from the use of the road when completed. The benefits and damages have no coincidence as to time or transaction. They occur at different times, and arise out of transactions entirely distinct from each other. Take an example. A owns two lots in a village, each of the value of $500 ; a company locates its railway through the village, and appropriates one of the lots for its right of way. By this act, A is damaged to the extent of the value of his property taken. Two years afterwards, when the railway is built, the resulting benefit from the road adds $500 to the value of A's other lot. Now, in compensating A for his property taken, what difference does it make whether it be called compensation for the value of the property taken, or damages for the injury sustained ? The constitution requires a compensation in money ; and whether it be called compensation for the value of the property taken, or compensation for the damages done by taking the property, by neither form of expression could the compensation be made in the resulting benefit instead of money. Take another illustration. A owns a farm through which a company locates its railway, and appropriates five acres of A's ground, worth fifty dollars an acre. The balance of A's farm, by the effect of the use of the road, is increased in value five hundred dollars. The damages and the benefit are not blended, but separate and distinct things. The benefit which A receives is the reflected benefit resulting to him in common with other land owners in the vicinity of the road, and was the precise object with a view to which the privileges were conferred on the company to build its road. And A could be no more justly required to pay the company for this advantage resulting from the general benefit of the road, than any other person in the community.

Where the injury does not consist in taking the owner's property, but in consequential damages by reason of the railway, the matter is entirely different. The resulting and consequential damages caused to adjacent proprietors, as well as the resulting and consequential benefits conferred by the reason of the road, can only be ascertained, and, indeed, can only arise fully, after the completion of the road. Where, therefore, a claim is set up

for damages for a resulting injury to adjacent land, and local and incidental benefit conferred upon the same land by the construction of the road is shown, the resulting injury and benefit would be so far blended in the value of the same land, that the owner would be entitled to recover nothing more than the consequent depreciation in the value of the land, resulting from the railroad. The benefits, however, thus entering into the estimate of the value of the land could only be such as were *local* and *incident* to that particular tract of land, and distinguishable from the general benefits resulting from the road.

It is said, however, that if this were a new question, the constitutional provision would be held to require full compensation in money; but that the question has been settled by precedent and former adjudication in this and other States, and that since the new constitution has removed the evil, it is not worth while disturbing the former decisions. I shall endeavor to show that this decision is not sustained by former adjudications; but if it were, it could not have my assent. Where there is ambiguity, or difficulty in ascertaining the true intent or legal effect of a provision of the constitution, former adjudications giving it a construction are entitled to great consideration. But where the language of the constitution is plain, clear, positive, and unambiguous, and there can be no just ground for judicial interpretation or construction, former decisions, not only at variance with the plain language and manifest intent of the constitution, but an acknowledged principle of universal law, should not be followed. Practice and precedent cannot change the constitution. How far the rights of property are to be affected by existing laws, enacted under our former State constitution, it is impossible to predict. It is sufficient to say that, if a latitudinarian construction had been heretofore given to the constitution, violative of the right of private property, there is no principle or sound reason requiring an adherence to it, because the evils to flow from it may have been diminished by a change in the constitution in that regard. Such an adherence to a former erroneous decision even aggravates the evil, by perpetuating an erroneous rule of construction, to be followed in analogous cases under the new constitution.

But, as I humbly conceive, this decision is by no means sustained to its full extent by judicial precedent. The first decision in this State having any material bearing on the question, is the case of *Cooper et al.* v. *Williams,* 4 Ohio Rep. 284, where the court allowed *incidental* benefits to be deducted, but expressly decided that general benefits could not be taken into the estimate. And the following remarks of Judge Lane, in delivering the opinion of the court in that case, touching this subject, are worthy of note:

"In considering this question, it becomes important to ascertain the nature of the benefits which ensue from the construction of the canal. They may be classed under the names of *general* or *accidental.*

The *general* advantages are the facilities of traveling, accessibility to market, reduction of the price of transportation, and the effect of these in enhancing the value of the land. The *accidental* advantages consist of the peculiar benefit conferred upon specific tracts of land, by the opportunities of basins, warehouses, and other commercial advantages; of all benefits of the water, consistent with its use for the canal, and for the means of navigation, etc., from water gates. To attain the *general advantages was the precise end for which the canal was constructed. They were designed for all, they belong to all, and may be claimed by all.* But the accidental benefits, although often of the highest moment to the individual, are of a nature so indefinite and uncertain, that no vested rights exist to exact them from the agents of the State."

This decision is against the validity of the statute under consideration. The general benefits which the statute allows to be deducted, Judge Lane says, " *belong to all, and may be claimed by all,*" etc.; and, therefore, cannot be taken into the estimate to reduce the damages.

The only other decision in this State having any very material bearing on this question, is *Symonds et al.* v. *City of Cincinnati,* 14 Ohio R. 147. This, as well as the other case, was decided by a divided court; and, when closely considered, it is manifest that it was not intended to go any further than the case of *Cooper* v. *Williams.* The compensation claimed was for taking a part of a lot for a street in the city of Cincinnati. The benefit, for which the deduction was claimed, was the increased value of the remainder of the lot by means of the street. It was, therefore, *the local and incidental* benefit to the balance of the same lot, which was allowed. This does not go far enough

to sustain the statute under consideration, which allows deductions for benefits generally conferred on the owner. But this last case, according to my information, has not the general approbation of the legal profession, as a well considered case. Thus far, and no farther, can the decisions in this State be brought to sustain the decision of the case before us.

The decisions in other States, where the constitutional provision on this subject is different from our constitution, could not be entitled to much weight here; but I am not aware that any of them have gone far enough to sustain such a statute as that under consideration. Mr. Redfield, in his learned treatise on the Law of Railways, page 135, says on this point: "But in consequence of numerous ingenious speculations in regard to possible advantages and disadvantages, arising from the public works, for which lands are taken, the whole subject has become, in this country especially, involved in more or less uncertainty. All the cases seem to concur in excluding *mere general and public benefit*, in which the owner of land shares, in common with the rest of the inhabitants of the vicinity, from being taken into consideration in estimating compensation."

In Kentucky, under a constitutional provision not substantially different from ours, a series of decisions have been made, consistently repudiating the doctrine upon which the decision of the majority of the court in this case is based; and the reasoning of Chief Justice Robertson is so pointed and forcible that I deem it worth while to make several extracts touching this subject. In the case of *Sutton's Heirs* v. *City of Louisville*, 5 Dana R. 33 and 34, he says:

"The public ought not to decide for any citizen how far, or whether at all, he will be peculiarly benefited by a public work or other thing for which his property is taken without his consent. If such an arbitrary and discretionary power can be exercised in such a case, the constitutional guarantee would be of little or no value; for it would be easy to suppose cases in which even a jury would decide that the construction of a road, or the opening or improving of a street or canal near or through the land of another, would incidentally benefit the owner, by its resulting facilities to him, or by a consequential enhancement of the estimated value of his property; when, in his own opinion, or even in fact, considering the use he makes or intends to make of it, such an improvement, with such a locality, would be inconvenient to him, and

injurious to his interest; and when, therefore, he would sooner pay to have it made elsewhere, and farther from him, or to prevent the making of it anywhere. Besides, the supposed or actual augmentation of the vendible value of one's estate is not only not advantageous to him, but may be positively disadvantageous and onerous, if he should be determined to keep and never sell it. And whether he will, or should, keep and enjoy it himself, or sell it, no one but himself can know or have any right to decide for him."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Hence, when the property of one citizen is taken without his consent, for the use of the whole community of which he is a member, the constitution imperiously requires—not that the public shall decide whether he is entitled to any compensation, but that a just compensation shall be paid, or secured; and that compensation implies the value at least of the thing taken. No citizen can be compelled to give his land to the public without an equivalent. And what is that equivalent but the value, in money, of the land surrendered to the public use? He may act unreasonably and unjustly, in an imaginable case, by insisting on pecuniary compensation, or in refusing to make the surrender without exacting the value of the property. But he has a right to insist on being paid the value of the thing taken from him, although he may be incidentally benefited, with others, in the appropriation of it to the public use. If, however, claiming more than the value of the property taken, he seek indemnity for consequential inconvenience or injury, then the true question will be, whether, upon a survey of all advantages, as well as disadvantages, which will be likely to result to him, the balance will be for or against him; and if ascertained to be in his favor, then, of course, he will be entitled to nothing for alleged damages for such inconvenience or injury, because, the whole case being properly considered in all its bearings, he will sustain no damage. Thus, and only thus, advantages and disadvantages may be compared and set off, the one against the other. And in reference to the question we are now considering, this is the only constitutional sense of the term 'advantage.'"

And in 9 Dana R. 115, in the case of *Jacob* v. *City of Louisville*, he further remarks on this subject:

"This court decided in the case of *Sutton's Heirs* v. *The City of Louisville*, 5 Dana 28, and in that of *Rice* v. *The Nicholasville, Danville & Lancaster Turnpike Company*, 7 Ibid. 81, that the constitutional guarantee of a just compensation to every person whose property shall be appropriated to public use without his consent, entitles the owner of property so appropriated, to the money value thereof at least; and we are not only not inclined to disturb the doctrine thus settled, but are still perfectly satisfied, that it recognizes the true and only effectual exposition of the constitution.

"A just compensation for property applied to public use, clearly implies, as we think, the value of the property in money. If the owner derive any incidental advantage or benefit from the manner in which it is applied to public use, others participate, in some degree, and perhaps equally, in the same or similar advantages resulting to them also; and it would be unjust to exact

Kramer *v.* The Cleveland & Pittsburgh Railroad Company.

from the one an equivalent for his incidental benefits, while the others enjoy theirs without the like exactions. Besides, if the owner of property can in any case be compelled to surrender it to the public use, without receiving the value of it in money, the constitutional guarantee would be ineffectual and delusive in many, and, probably, most cases; because the tribunal which decided on the retribution to which he may be entitled, is a portion of the public to whose use the property is applied, and may decide that the public appropriation of it will be beneficial to the owner, when, in his own judgment, or in fact, it will be injurious to him. And if he be required to accept in lieu of his property taken from him without his consent, any other thing than money, he may, in fact, receive less than an equivalent, or even nothing whatever of any actual value to him; because the value of every thing except money depends on opinion and accident. And if, as in this case, the compensation be offered in mere speculative advantage, which may exist only in the opinion or imagination of an interested jury, he may receive nothing of value to himself, or, in his own opinion."

3d. The third ground of objection is equally fatal to the validity of this statute. It is provided that the company may determine on its appropriation, procure the appointment of the appraisers, have the damages assessed and returned, and, on the payment of the amount to the clerk, or securing the same, may enter upon and hold the land, without *notice to the owner* of any of the proceedings, and without providing any *fair and equitable mode of proceeding before a competent tribunal* where the owner can be heard, and the matter judicially passed upon, either as to the *necessity* of the appropriation for the purposes of the company, or the *fairness and legality* of the assessment of the damages. In other words, it provides that private property may be seized, and the owner divested of his right, without an opportunity of invoking the exercise of the judicial power, either as to the question of the *necessity* of the appropriation, or the assessment of the damages. The effect of this is to strip a man of his property without an opportunity of being heard, or of appealing to the judicial power of the State for the protection of his rights. If this statute be constitutional and valid, the proceedings authorized by it become effectual and final in divesting the owner of his property, and transferring it to the company, and the owner is left wholly without the hope of redress thereafter. If he should refuse to receive the compensation assessed, and sue the company at law for damages, the proceedings, under this statute for the

appropriation and assessment of damages, would be a bar to his action. The decision of this very case is conclusive of that. Although the owner might conceive himself grossly wronged, and even outraged, by the conduct of the appraisers in estimating his damages; and although he might know that the company had grossly erred in taking too much land, or land unnecessary for the purposes of its railway, yet his mouth would be closed by the terms of this law, and he could not be heard before any judicial tribunal of the State. The effect of the statute is to give the company the authority to determine as to the *quantity* and *form* of the appropriation. If the company should determine to appropriate twenty acres of ground, including the owner's own domicil, when two acres of ground without it would be all-sufficient for the appropriate uses of the railroad, the owner would be precluded from contesting the matter before any judicial tribunal, by the effect and operation of this law.

When the right of eminent domain is exercised by the State itself, the proper authorities of the government would of course be allowed to determine as to the necessity of the appropriation. But when this prerogative of the civil power is delegated to a private corporation, with a view to resulting public convenience, the corporation, in subjecting private property to its uses, does not take the property for the State, but for itself, and makes it, not the property of the State, but the private property of the company. When, therefore, private property is thus taken, not by the government, but by a private person or corporation, the owner, who is to be divested of his right, should not be precluded from questioning the necessity or legality of the appropriation before a judicial tribunal. And when the appropriation has been proper, but gross injustice done by the appraisers in the assessment of the damages, the owner of the property has a right, by the constitution of the State, to have the matter passed upon by a judicial tribunal. The seventh section of the bill of rights, in the constitution under which this law was enacted, provided, "*That every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by the due course of law, and right and justice administered without denial or delay.*"

But under the authority of this statute, a man may be injured in his possessions, and the very acts and proceedings which occasion the injury be set up as a bar to any remedy for his redress by due course of law. The proceedings under this statute are simply ministerial, and do not call into exercise any judicial authority. The appointment of the appraisers by the court or judge, and the assessment by the appraisers, and return to the clerk of the court, are mere ministerial, and not judicial acts. And the owner is left without any appeal, or other remedy to review these proceedings before judicial authority; and, if the statute be valid and effectual, it vests the property absolutely in the company, when the proceedings have conformed to its requirements.

The provisions in the general laws of this State, as well as almost, if not quite, all the special provisions in the charters of corporations, for the appropriation of private property to public purposes, have provided for an appeal or writ of certiorari to the court of common pleas, and a review of the proceedings after the assessment by the appraisers, before judicial authority. But no such proceeding is authorized under this statute, and the appropriation under it becomes absolutely conclusive, if the statute is of binding authority.

It is no answer to this, to say that, in this particular case, notice was given to the plaintiff, and he appeared before the appraisers. The statute neither required nor authorized any such notice or appearance, nor did it authorize the plaintiff to be heard by himself or counsel. The question, however, is not what the parties actually did outside of the authority of the statute, but whether the statute prescribed a lawful and constitutional mode for divesting the plaintiff of his property, and transferring it to the defendant. If it did not, I humbly conceive, the constitutional deficiencies of it cannot be supplied by the extrinsic proceedings in the appropriation, and thus give to an unconstitutional enactment the force and validity of law.

If I am correct in this view, the statute is, in this respect, also in violation of that " acknowledged principle of universal law," of which the constitutional provision, " that private property shall ever be held inviolate," is declarative.

Blackstone, said to be the most authoritative commentator upon the principles of English constitutional law, on the subject of the right of private property, remarks:

" The laws of England are, therefore, in point of honor and justice, extremely watchful in ascertaining and protecting this right. Upon this principle, the Great Charter has declared that no freeman shall be disseized, or divested, of his freehold or his liberties, or free-customs, but by the judgment of his peers, or by the laws of the land. And by a variety of ancient statutes it is enacted that no man's lands or goods shall be seized into the King's hands, against the Great Charter, and the law of the land; and that no man shall be disinherited *nor put out of his franchises or freehold, unless he be duly brought to answer, and be fore-judged by course of law; and if any thing be done to the contrary, it shall be redressed and holden for none.*" Wendell's Blackstone, 1 vol. 138.

And Chancellor Kent, in the case of *Gardner* v. *Village of Newburg*, 2 John. Ch. R. 166, in reference to the taking of an interest in realty for the public use, said:

" It is a part of the freehold of which no man can be disseized *but by lawful judgment of his peers, or by due process of law.* This is an ancient and fundamental maxim of common right to be found in *Magna Charta*, and which the legislature has incorporated into an act declaratory of the rights of the citizens of this State."

And the same learned jurist, in a note in his Commentaries, vol. 2, page 399, said on this subject:

" The government *is bound, in such cases, to provide some tribunal* for the assessment of the compensation, or indemnity, *before which each party may meet, and discuss their claims* on equal terms."

And the most recent American writer on the law of railways, touching the subject of the proceedings for the assessment of the compensation to be paid the owner for land appropriated by railway companies, says: " Thus it has been held, that notice in writing to the owner of the land to be taken, its situation and quantity, must be given. But the form of the notice, or whether signed by the company, or by the commissioners, is not important." Redfield on Railways 140.

It is said, however, that this statute is sustained by judicial decisions as to proceedings under similar statutes; and that which

Kramer *v.* The Cleveland & Pittsburgh Railroad Company.

is mainly relied on is the case of *Symonds* v. *The City of Cincinnati,* 14 Ohio Rep. 174. Let this statute be tested by this decision most relied on, and which goes further than any other to support it. The court in that case said : "*Provision must* be made by law for the assessment of the damages the owner of the property will sustain, *in some fair and equitable manner, and before some competent tribunal, where the parties can be heard,*" etc. Does this statute provide a *fair and equitable manner* for the assessment of the damages ? Does it provide a competent tribunal where the parties can be heard ? Let the statute, in these respects, speak for itself.

I hold, therefore, that, if there be any certainty and safety in a written constitution, fixing the great landmarks of man's rights of property, and declaring the fundamental principles of universal law, the statute under consideration is plainly unconstitutional and void :

1st. Because it allowed private property to be taken from the owner, and transferred to the company, without payment of *a compensation to the owner,* but on the mere payment of the amount of an assessment of damages to *the clerk of the court,* or, at its option, on merely *giving security* for such payment, and that, too, without the knowledge of the owner :

2d. Because it did not require the compensation for the property taken to be paid *in money,* but allowed it to be paid, in whole, or in part, in *prospective* and *speculative benefits* anticipated from the railroad : And,

3d. Because it provided *no fair and equitable* mode for the assessment of the damages, or *competent tribunal* before which the owner had a right *to appear and be heard,* and have his rights passed upon by judicial authority.