*13
 
 Hart, J.
 

 The sole question here is whether the real property of the appellant is entitled to exemption, from taxation, under favor of Section 5351, General Code, on the ground that it is public property used for a public purpose.
 

 A brief statement of the authority under which the appellant was organized and of its authority to hold and operate, and its method of operating, the properties in question will be helpful in giving answer to this question. The Dayton Metropolitan Housing Authority was organized in 1934 pursuant to the Ohio Housing Authority Law (Sections 1078-29 to 1078-41, inclusive, General Code, 115 Ohio Laws, pt. 2, 56), later several times amended and supplemented in 1937 and 1938 (117 Ohio Laws, 324, 334, 337, 799 and 915) before the properties in question were purchased.
 

 In 1932, the General Assembly enacted the State Housing Law (Sections 1078-1 to 1078-28, General Code, 114 Ohio Laws, pt. 2, 78), by which there was created a State Board of Housing consisting of seven members, three of whom should be directors of certain departments of the state government, and the remaining four of whom should be appointed by the Governor. This board was clothed with general authority over all housing companies authorized to be organized under this act, and approval by the board was required as to the selection of a housing authority area.
 

 By the amendments and supplements of 1937 and 1938 the authority of the housing board and the scope of the housing act were greatly enlarged for the purpose of permitting the municipalities of the state to take advantage of the provisions of the “United States Housing Act of 1937” as amended (Title 42, Sections 1401 to 1430, U. S. Code), which created the United States Housing Authority as agent of the federal government to carry out its declared purpose of granting
 
 *14
 
 loans and thus aiding municipalities in clearing slum areas and in constructing low rent housing for the occupancy by persons of low income.
 

 If the State Board of Housing determines that a need exists for a local housing authority it issues a certificate to that effect, whereupon there is appointed a local housing authority consisting of five members, one appointed, by the Common Pleas Court, one by the Probate Court,. one by the county commissioners of the county and two by the mayor of the most populous city in the territory included in the housing district.
 

 Section 1078-34, General Code, provides that such local authority created under the act ‘1 shall constitute a body corporate and politic, ’ ’ and shall have, among ■other powers,-the ■ authority to acquire property by gift, purchase, or by eminent domain, and to construct and operate tenement houses thereon; to comply with any conditions which the federal government may attach to its financial aid to the project; to borrow money on its notes or bonds and to secure the same by mortgages upon the property 'held by it or the revenues arising therefrom; and.to enter into all kinds of contracts relative to; the property.: . .
 

 On default lipón any of its obligations a receiver may be appointed.by the court to operate the property and •liquidate, the indebtedness of the authority.
 

 • Section 1078.,-36, General Code, declares that all such property, both personal and real, held by an authority, shall /‘be . deemed- public property, for public use,” while Section 1Q78-44, General Code, provides that the bonds, of an authority shall not be a debt of the county, .the state-or any .subdivision thereof, and neither shall be liable thereon,-nor in any event shall such bonds or' obligations be payable out of any funds or properties other than those, of s.ubh authority, and that the bonds shall not,constitute an indebtedness within the mean
 
 *15
 
 ing of any constitutional or statutory debt limitation or restriction.
 

 Section 1078-49®, General Code, enacted July 1,1938, provides that “a housing authority created under this act shall constitute a political subdivision of the state of Ohio within the meaning of Section 5546-2 of the General Code,” which means nothing more than that the authority is exempt as a consumer from the Ohio sales tax. Significantly, however, the General Assembly did not, in this act, specially exempt the real estate of the authority from ordinary real estate taxes.
 

 The emergency clause attached to the supplemental enactment of August 1933 gives some real insight into the purposes of the law and the reasons for its enactment. The General Assembly declared (115 Ohio Laws, pt. 2, 61), as follows:
 

 “The necessity for the immediate effective date of this act lies in the fact that, whereas there is a demand in congested sections of Ohio for housing of families of low income and for the reconstruction of slum areas, and whereas no existing laws of the state of Ohio provide for the organization and operation of public housing authorities as contemplated in the national recovery act which would enable Ohio to secure grants and loans from the United States government for the purpose of providing housing for families of low income, and whereas such laws are in existence in other states, or such legislation is under consideration in other states, which will enable such states to obtain a grant and borrow money from the United States government, and whereas such funds secured from the United States government by public housing authorities will make possible the beginning immediately of building projects which will furnish employment to Ohio citizens. Therefore, this act shall come into effect immediately.”
 

 Within the meaning of the general tax exemption
 
 *16
 
 statutes of this state as authorized by Section 2, Article XII of the Constitution, public property to be exempt must be public property used exclusively for a public purpose. The General Assembly has declared all property owned by housing authorities organized under and by virtue of the state housing act to be for a public use, but while such a declaration is entitled to great respect it is by no means conclusive.
 
 Block
 
 v. Hirsh, 256 U. S., 135, 65 L. Ed., 865,16 A. L. R., 165, 41 S. Ct., 458;
 
 United States
 
 v.
 
 Gettysburg Electric Ry. Co.,
 
 160 U. S., 668, 40 L. Ed., 576, 16 S. Ct., 427;
 
 Alright
 
 v.
 
 Sussex County Lake & Park Comm.,
 
 71 N. J. Law, 303, 57 A., 398, 108 Am. St. Rep., 749, 69 L. R. A., 768;
 
 Hogue
 
 v.
 
 Housing Authority of North Little Rock,
 
 201 Ark., 263, 144 S. W. (2d), 49;
 
 Matter of New York Housing Authority
 
 v.
 
 Muller,
 
 270 N. Y., 333, 1 N. E. (2d), 153, 105 A. L. R., 905.
 

 Whether a use is public is always ultimately a question for judicial determination.
 
 McQuillen
 
 v.
 
 Hatton,
 
 42 Ohio St., 202;
 
 Wells
 
 v.
 
 Housing Authority of the City of Wilmington,
 
 213 N. C., 744, 197 S. E., 693. And it does not lie within the power of the General Assembly to make a use a public use which in its nature is not. 50 Corpus Juris, 866;
 
 Smith, Assessor,
 
 v.
 
 Housing Authority of City of Daytona Beach,
 
 148 Fla., 195, 3 So. (2d), 880.
 

 Public property, within the meaning of that term as used in state constitutions or in statutes exempting such property from taxation, embraces only such property as is owned by the state or some political subdivision thereof, and title to which is vested directly in the state or one of its political subdivisions, or some person holding exclusively for the benefit of the state.
 
 Board of Trustees of Gate City Guard
 
 v.
 
 City of Atlanta,
 
 113 Ga., 883, 39 S. E., 394, 54 L. R. A., 806. This is clearly indicated by the careful wording of our general tax exemption statutes exempting public property
 
 *17
 
 from taxation. The doctrine of
 
 ejusdem generis
 
 here applies. Note the language of exemption which by construction excludes every other type of property from the privilege of exemption:
 

 “Real or personal property
 
 belonging exclusively to the state
 
 or
 
 United States,
 
 and public property
 
 used for a public purpose”
 
 (Section 5351, General Code) “buildings belonging to counties and used for holding courts, and for jails or county offices, with the ground, not exceeding ten acres in any county, on which such buildings are erected, shall be exempt from taxation” (Section 5352, General Code). (Italics ours.)
 

 The philosophy or reason for the tax exemption of public property, as described in the statute, is that inasmuch as it is purchased and maintained by public revenues derived from taxation, its taxation would not inure to any public advantage. In such case, the tax debtor is also the tax creditor. The exemption of such property from taxation avoids the burden of the collection of tax revenues from and their disbursement to the same public entity of tax revenues arising from and devoted to the same property. The product of one tax should not be made the subject of another.
 

 This reason for exemption does not obtain in the case of the property in question. The state or public, as such, has no investment in the property, makes no use of it for governmental purposes, and is under no obligation for its upkeep or the bonds. Its taxation results in an obligation of the authority, the real owner of the property, to the state or municipality in the form of taxes which would compensate the state or municipality for the additional governmental burden imposed by the project, including such items as water service, fire and police protection, and support of public schools, which burden, in proper proportion, should be borne by this property. This obligation is no different from other obligations of the authority in
 
 *18
 
 currecl in connection with the operation of the property. After all, it is the privilege of the state to say what aid, if any, it will give to snch enterprises, and this must be done in unmistakable terms.
 

 To entitle the appellant’s property to exemption from taxation it must not only be public property, but property devoted exclusively to a public use. Section 2, Article XII of the Constitution;
 
 Pfeiffer et at., Trustees,
 
 v.
 
 Jenkins et al., Bd. of Tax Appeals,
 
 141 Ohio St., 66, 46 N. E. (2d), 767. Perhaps the Greneral Assembly in the adoption of the housing act, the form of which was suggested by the'federal housing authorities, eliminated the proposed tax exemption provision on the theory that it ran counter to the state constitm tional requirement to the effect that to be exempt from taxation the property must be public property used
 
 exclusively
 
 for public purposes. In this respect, the Ohio Housing Authority Law differs from that of most other states, and accounts, in large .measure, for the conflict of judicial decisions on this subject.
 

 A public use of the property is essential, a public benefit is not sufficient. The term “public use” is a broad and flexible one. The courts, therefore, have found it impossible to frame, as well as inadvisable to attempt to frame, a definition of “public use” which would absolutely indicate its limits by including everything therein which constitutes a public use and excluding everything which does not. 50 Corpus Juris, 864. Section 93.
 

 There are two views as to what constitutes a public use. One is that a use of property to be public, must be a use or right of use on the part of the public or some limited portion thereof
 
 (Fountain Park Co.
 
 v.
 
 Hensler,
 
 199 Ind., 95, 155 N. E., 465, 50 A. L. R., 1518;
 
 Ferguson
 
 v.
 
 Illinois Central Rd. Co.,
 
 202 Iowa, 508, 210 N. W., 604, 54 A. L. R., 1;
 
 Smith
 
 v.
 
 Cameron,
 
 106 Ore., 1, 210 P., 716, 27 A. L. R., 510) while the other is
 
 *19
 
 that a use is public if it is a public benefit, utility or advantage (50 Corpus Juris, 865, note 84;
 
 Spratt
 
 v.
 
 Helena Power Transmission Co.,
 
 35 Mont., 108, 88 P., 773, 8 L. R. A. [N. S.], 567;
 
 Nash
 
 v.
 
 Clark,
 
 27 Utah, 158, 75 P., 371, 101 Am. St. Rep., 953, 1 L. R. A. [N. S.], 208). Under the first view the term “public use” means of, or belonging to, the people at large, open to all the people to such extent as the capacity of the property admits, and it implies a possession, occupation and employment of the property by the public at large or by a public agency. 50 Corpus Juris, 865, Section 94. The use must be a use by the public or by some public or g^asi-public agency, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity of the state and its people. 50 Corpus Juris, 865, note 83;
 
 Healy Lumber Co.
 
 v.
 
 Morris,
 
 33 Wash., 490, 74 P., 681, 63 L. R. A., 820, 99 Am. St. Rep., 964;
 
 Neitzel
 
 v.
 
 Spokane International Ry. Co.,
 
 65 Wash., 100, 117 P., 864, 36 L. R. A., (N. S.), 522. That only is a public use where the government is supplying its own needs, or is furnishing facilities for its citizens as a matter of public necessity or convenience which, on account of their peculiar character, it is proper, useful and needful for the government to provide.
 
 Brown
 
 v.
 
 Gerald,
 
 100 Me., 351, 61 A., 785, 70 L. R. A., 472, 109 Am. St. Rep., 526. The “public benefit” is not synonymous with “public use.”
 
 Smith
 
 v.
 
 Cameron, supra; Motoramp Garage Co.
 
 v.
 
 City of Tacoma,
 
 136 Wash., 589, 241 P., 16, 42 A. L. R., 886;
 
 Reed
 
 v.
 
 City of Seattle,
 
 124 Wash., 185, 213 P., 923, 29 A. L. R., 446;
 
 Wisconsin River Improvement Co.
 
 v.
 
 Pier,
 
 137 Wis., 325, 118 N. W., 857, 21 L. R. A. (N. S.), 538; 50 Corpus Juris, 865, note 83. See 1 Nichols on Eminent Domain (2 Ed.), 129, 130, 131, Section 40, quoted in
 
 Dornan
 
 v.
 
 Philadelphia Housing Authority,
 
 331 Pa., 209, 217, 200 A., 834.
 

 In 54 A. L. R., 1, 7, the case of
 
 Ferguson
 
 v.
 
 Illinois
 
 
 *20
 

 Central Rd. Co., supra,
 
 is annotated upon the question of the right to acquire by eminent domain property for a public use. After citing cases from many state and federal jurisdictions, the editor says: “It may be stated at the outset that the trend .of authority is away from any general definition of the term ‘public use’ as synonymous with public benefit, and to restrict it, except in certain rather well-defined fields, to the meaning of use by the public.
 
 *
 
 * *
 

 “The weight of authority supports the general proposition that the term ‘public use’ under the law of eminent domain is not the equivalent of public benefit, public convenience or welfare, but that, in order to make the use a public one for which the power of eminent domain may be exercised, there must be a right on the part of the public, or some portion of it, or some public or quasi-public agency on behalf of the public, to use the property after it is condemned. ’ ’ In the case of
 
 Lowell
 
 v.
 
 City of Boston,
 
 111 Mass., 454, 15 Am. Rep., 39, the Supreme Judicial Court of Massachusetts held that the Legislature of that state could not outhorize the city of Boston to lend money to owners of land in a portion of the city which was burned for the encouragement of the rebuilding of homes, because “the promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object.” Mr. Justice Wells, speaking for the court in this case, in pointing out that incidental public benefits could not be regarded as a public use, assumed that the right to take property for public purposes and the right to tax for public purposes must be subjected to a same test. In other words, the rule must be that property can only be acquired by eminent domain for public use when the purchase price can be provided from the public revenues. The test as to
 
 *21
 
 whether property may be exempted from taxation on the ground that it is public property used exclusively for public purposes, is whether it may be procured through eminent domain or purchased and maintained for the use to which the property is devoted through taxes levied against other property located within the taxing unit which would be affected thereby.
 

 If the property cannot be purchased or maintained through a tax levy on all property of the taxing district, it may not be exempted from taxation, since this would indirectly impose an additional and discriminating tax burden on other property in the taxing district.
 

 In
 
 Opinion of the Justices,
 
 211 Mass., 624, 98 N. E., 611, 42 L. R. A. (N. S.), 221, the court had under consideration the constitutionality of a legislative plan of the commonwealth to purchase land, develop the same and build houses for rent. By statute (Acts 1917, Ch. 310) such development was to be managed and operated by and under a corporation known as the Homestead Commission. The purpose and object of the project was to provide homes for mechanics, laborers and wage earners and to improve the public health by providing homes in the more thinly populated areas of the state for those who might otherwise live in the most congested areas of the state. All the participating members of the Supreme Judicial Court of Massachusetts, in passing on the question submitted to them, in their opinion said: ‘ ‘ The question is whether this is a public use. * * * The dominating design of a statute requiring the use of public funds must be the promotion of public interests and not the furtherance of the advantage of individuals. However beneficial in a general or popular sense it may be that private interests should prosper and thus incidentally serve the public, the expenditure of public money to this end is not justified. Government aid to manufacturing
 
 *22
 
 enterprises, the development of water powers and other natural resources by private persons or corporations with public funds, either through loans or by more indirect method of exemption from taxation or taking of stock, have been universally condemned by courts throughout the country, although often attempted by legislation.”
 

 The same court in the case of
 
 Allydonn Realty Corp.
 
 v.
 
 Holyoke Housing Authority,
 
 304 Mass., 288, 23 N. E. (2d), 665, had before it, in 1939, the question as to whether, under the housing authority law of Massachusetts, public moneys and the power of' taxation were being utilized for purposes that were in their nature public, or for purposes of private advantage to particular persons. In the meantime, since the decision in
 
 Opinion of the Justices, supra,
 
 the state of Massachusetts had, in 1917, adopted a constitutional amendment to the effect that “the maintenance and distribution at reasonable rates, during time of war, public exigency, emergency or distress of a sufficient supply of food and other common necessaries of life
 
 and the providing of shelter
 
 are public functions, and the commonwealth and the cities and towns therein, may take and may provide the same for their inhabitants in such manner as the general court shall determine.” See 18 Boston University Law Review, 83, 90.
 

 The court, in sustaining the constitutionality of the Massachusetts Housing Authority, considered the case of
 
 Lowell
 
 v.
 
 Boston, supra,
 
 and reviewed
 
 Opinion of the Justices,
 
 above cited, and distinguished it from the
 
 Ally down case
 
 in that in the former case there was no provision for the eradication of sources of disease and danger; and there was no slum clearance and no provisions for the elimination of unsafe or unsanitary dwellings; whereas, under the present housing act of Massachusetts there is provision “for the elimination in each instance of unsafe or unsanitary buildings con
 
 *23
 
 taining dwelling units substantially equal in number tc the newly constructed dwelling units provided by the project,” and the real purpose of the Massachusetts statute is “the elimination of slums and unsafe and unsanitary dwelling, and the provision by public funds of low-rent housing is only a means by which the main object is to be accomplished.” Later on, in the course of this opinion, the character of the Ohio State Housing Act, in this respect, will be examined and considered.
 

 The case of
 
 United States
 
 v.
 
 Certain Lands in City of Louisville,
 
 78 F. (2d), 684, involved an action brought by the United States government to condemn certain property for a federal housing project in the city of Louisville. The petition alleged that the lands were to be used for the construction of a low-cost housing and slum-clearance project under the provisions of Title 2 of the National Industrial Recovery Act (48 Stats, at L., 195) and were “needed for a public use and purpose.” The Circuit Court of Appeals for the Sixth District, which includes the state of Ohio, sustained a demurrer-to the petition holding that private property can be condemned by the United States only when necessary for a public purpose; and that “the assertion that the taking of property to relievé unemployment and to improve living conditions among low-salaried workers is a taking for a public use rests upon the view that any taking which will advance the interest or well-being of a selected group of citizens will result in a benefit or advantage to larger groups or the entire community.” In discussing the validity of this contention, the court in its opinion said:
 

 “The term ‘public use,’ as applied to the federal government’s power of eminent domain, is not susceptible of precise definition under the Supreme Court, decisions. It includes, of course, property needed for use by the public through its officers and agents in per
 
 *24
 
 forming their governmental duties.
 
 Chappell
 
 v.
 
 United States, supra
 
 [160 U. S., 499, 40 L. Ed., 510, 16 S. Ct., 397]. The trial court was of opinion that it means use by the government in carrying out its legitimate governmental functions, or a use in relation thereto open to all the public though practically available only to a part of it. The government contends that it means any use which will promote the general welfare through benefits or advantages conferred upon a considerable number of residents of the community. It points to statements in the authorities to the effect that use by the general public is not a universal test of the term.
 
 Strickley
 
 v.
 
 Highland Boy Mining Co.,
 
 200 U. S., 527, 531, 26 S. Ct., 301, 50 L. Ed., 581, 4 Ann. Cas., 1174. Reference is also made to decisions holding that it is not a fatal objection to the taking that the use is to be limited to a small group or to a single person.
 
 Fall-brook Irrigation District
 
 v.
 
 Bradley,
 
 164 U. S., 112, 161, 17 S. Ct., 56, 41 L. Ed., 369;
 
 Mt. Vernon-Wood-berry Cotton Co.
 
 v.
 
 Alabama Power Co.,
 
 240 U. S., 30, 32, 36 S. Ct., 234, 60 L. Ed., 507;
 
 Rindge Co.
 
 v.
 
 Los Angeles County,
 
 262 U. S., 700, 707, 43 S. Ct., 689, 67 L. Ed., 1186. The proceedings in these cases were instituted, however, under state statutes passed to effectuate the purposes of a declared public policy of the state. What the cases hold is that there is nothing in the Fourteenth Amendment to prevent a state from exercising the power of eminent domain to carry into effect a public policy which, in the light of the needs and exigencies of the state, may be reported as pro-motive of the public interest. This was the ground of decision in
 
 Clark
 
 v.
 
 Nash,
 
 198 U. S., 361, 25 S. Ct., 676, 49 L. Ed., 1085, 4 Ann. Cas., 1171, and
 
 Green
 
 v.
 
 Frazier,
 
 253 U. S., 233, 40 S. Ct., 499, 503, 64 L. Ed., 878. In the latter case, the court upheld state legislation authorizing the state to organize a bank and operate it, to establish elevators, warehouses and flour mills, and
 
 *25
 
 to engage in the businesses of manufacturing and marketing, and the building of homes for residents of the state. The court said: ‘If the state sees fit to enter upon such enterprises as are here involved, with the sanction of its Constitution, its Legislature and its people, we are not prepared to say that it is within the authority of this court, in enforcing the observance of the Fourteenth Amendment, to set aside such action by judicial decision. * * * ’
 

 “Thus in these and other cases involving state action the court dealt with the subject of public use as it pertained to the powers of the sovereign claiming the right to take. It must be similarly dealt with in the case at bar. As so considered with reference to the federal government, it does not, in our opinion, include the relief of unemployment as an end in itself or the construction of sanitary houses to sell or lease to low-salaried workers or residents of slum districts. The tearing down of the old buildings and the construction of new ones on the land here sought to be taken would create, it is true, a new resource for the employment of labor and capital. It is likewise true that the erection of new sanitary dwellings upon the property and the leasing or the selling of them at low prices would enable many residents of the community to improve their living conditions. It may be, too, that these group benefits so -far as they might affect the general public, would be beneficial. If, however, such a result thus attained is to be considered a public use for which the government may condemn private property, there would seem to be no reason why it could not condemn any private property which it could employ to an advantage to the public. There are perhaps many properties that the government could use for the benefit of selected groups. It might be, indeed, that by acquiring large sections of the farming parts of the country and leasing the land or selling it at low prices
 
 *26
 
 it could advance the interest of.many citizens of the country, or that it could take over factories and other businesses and operate them upon plans more beneficial to the employees or the public, or even operate or sell them at a profit to the government to the relief of the taxpayers. The public interest that would thus be be served, however, cannot, we think, be held to be a public use for which the government, in the exercise of its governmental functions, can take private property. The taking of one citizen’s property for the purpose of improving it and selling or leasing it to another, or for the purpose of reducing unemployment, is not, in our opinion, within the scope of the powers of the federal government.”
 

 The case above cited and quoted from was appealed to the Supreme Court of the United States, but after pending there for some time it was dismissed by the government because the lands in question had, in the meantime, been acquired by purchase.
 

 At this point it is pertinent to observe that the state of Ohio has not, 'either by constitutional permission or by statutory enactment, embarked on any policy authorizing the taking of private property at the expense of the public revenues for any purpose which constitutes merely a public benefit as distinguished from a public and governmental use.
 

 In recent years, there have been enacted in not less t.ba.ri 39 states of the union, state housing acts more or less similar to the Ohio act. Questions relating to the exercise of the power of eminent domain to secure real estate for the projects organized under these acts, and the right of exemption of such property from taxation, have been before the courts of last resort of many of these states on frequent occasions.. A partial list of such cases will be found in the opinion of the court in the case of
 
 Humphrey
 
 v.
 
 City of Phoenix,
 
 55 Ariz., 374, 102 P. (2d), 82. In the great majority of these
 
 *27
 
 cases, the power of eminent domain relating to, or the right of tax exemption of, the project property has been upheld on the ground that the property is devoted to a public use. However, there are strong dissenting opinions in the courts of several of these states. In twenty-nine states of the union, the exemption of housing project property from taxation is specifically provided for in the state housing act. In other states it is held that the object of the housing acts meets the test of public purpose since they “contain the elements of public benefit,” or “tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the community” (See Mills on Eminent Domain, 15, Section 12, quoted in
 
 Jacobs
 
 v.
 
 Clearview Water Supply Co.,
 
 220 Pa., 388, 69 A., 870, 21 L. R. A. [N. S.], 410); or since “the primary purpose of the * * * housing act is slum clearance and the incidental auxiliary purpose is low-cost housing.”
 

 In fact, in some of the state housing acts, slum clearance is definitely required either by the location of the project where it will eliminate a slum area or by a stipulation that for each housing unit constructed • a corresponding slum unit shall be destroyed.
 
 Allydonn Realty Corp.
 
 v.
 
 Holyoke Housing Authority, supra.
 
 Some of the courts have held that the elimination of slums as a feature of the housing project is the element which gives the newly constructed property a public quality or a public use.
 
 Dornan
 
 v.
 
 Philadelphia Housing Authority,
 
 331 Pa., 209, 200 A., 834;
 
 Spohn
 
 v.
 
 Stewart,
 
 268 Ky., 97, 112, 103 S. W. (2d), 651;
 
 Matthaei
 
 v.
 
 Housing Authority of Baltimore City,
 
 177 Md., 506, 9 A. (2d), 835;
 
 State, ex rel. Porterie, Atty. Genl.,
 
 v.
 
 Housing Authority of New Orleans,
 
 190 La., 710, 182 So., 725;
 
 McNulty
 
 v.
 
 Owens, Mayor,
 
 188 S. C., 377, 199 S. E., 425;
 
 Knoxville Housing Authority, Inc.,
 
 v.
 
 City of Knoxville,
 
 174 Tenn., 76, 123 S. W. (2d),
 
 *28
 
 1085. One state court of last resort suggests that if a state' act authorized housing apart from slum clearance, there would be grave doubt of its constitutionality.
 
 Chapman
 
 v.
 
 Huntington, W. Va., Housing Authority,
 
 121 W. Va., 319, 342, 3 S. E. (2d), 502.
 

 It is significant that there is no such provision or requirement for slum clearance in the housing act of this state. In some of the states above referred to the courts hold that private enterprises may be carried on by governmental subsidies as a public use, such as gasoline filling stations and ice plants.
 
 Holton
 
 v.
 
 City of Camilla,
 
 134 Ga., 560, 68 S. E., 472, 31 L. R. A. (N. S.), 116. In such states £ipublic use” is necessarily defined as any public benefit or advantage which tends to enlarge the resources or promote the productive power of the inhabitants of certain areas of the state.
 

 On the contrary, it has been the constitutional, legislative and judicial policy of this state to prevent the use of public funds in any function which is not governmental in character, or which does not constitute a use for strictly public purposes.
 
 City of Cincinnati
 
 v.
 
 Lewis, Aud.,
 
 66 Ohio St., 49, 63 N. E., 588;
 
 State, ex rel. City of Toledo,
 
 v.
 
 Lynch, Aud., 88
 
 Ohio St., 71, 102 N. E., 670, 48 L. R. A. (N. S.), 720, Ann. Cas. 1914D, 949;
 
 City of Cincinnati
 
 v.
 
 Harth,
 
 101 Ohio St., 344, 128 N. E., 263,13 A. L. R., 308;
 
 City of Cleveland
 
 v.
 
 Ruple,
 
 130 Ohio St., 465, 200 N. E., 507, 103 A. L. R., 853.
 

 The question now before the court is in all material respects the same as that considered by this court in the case of
 
 Columbus Metropolitan Housing Authority
 
 v.
 
 Thatcher, Aud.,
 
 140 Ohio St., 38, 42 N. E. (2d), 437. In that case this court held that even though property be public property it may not be exempted from taxation unless it is used exclusively for a public purpose, and that the property there under consideration, which was used in the same manner as the property involved in this case, was not used exclusively for
 
 *29
 
 a public purpose. This court does not recede from its former holding.
 

 Furthermore, this court is not alone in its position on this matter. In the case of
 
 State, ex rel. Ferguson, Housing Admr.,
 
 v.
 
 Donnell,
 
 349 Mo., 975, 163 S. W. (2d), 940, involving the claimed exemption from taxation of certain personal property owned by the Federal Housing Administrator and used in furnishing and equipping real estate owned by him, on the ground that the statutes of Missouri provide for the exemption of “lands and lots,
 
 public buildings and structures with their furniture and equipments, belonging to the United
 
 States,” (Italics ours) the Supreme Court of Missouri held that while the title to the real property was in the name of the Federal Housing Administrator, and fox the purposes of this determination might be assumed to belong to the United States, yet the buildings so used were not public buildings in contemplation of the exemption statute so as to exempt the personal property used therein. The court in its opinion quotes from the case of
 
 Lewis
 
 v.
 
 Commonwealth,
 
 197 Ky., 449, 247 S. W., 749, as follows: “ ‘Manifestly that language means a place exposed to the public, and where the public gather together or pass to and fro, and the building referred to means a public one, axxd belonging to or used by the public for the transaction of public or quasi public business, such as a schoolhouse, courthouse, or other similar one,’ ” and then concludes its opinion as follows: “The apartments iix these buildings are rented to private individuals in which these individuals and their families live. In fact, they are rented in competition with privately owned apartment buildings. They are not open to the public, and, therefore, are not public buildings. Their furniture and equipment, therefore, are not exempt from taxation under this section of our statutes.”
 

 
 *30
 
 In the case of
 
 State, ex rel. Burbridge,
 
 v.
 
 St. John, Assessor,
 
 143 Fla., 544, 197 So., 131, the Supreme Court of Florida had before it the question of the exemption from txation of all property owned and controlled by the Housing Authority of the City of Jacksonville: The Constitution of Florida exempts from taxation, not municipal corporations as such, but property that is held and used exclusively by them for municipal purposes. The court held that the “property owned and controlled by the Housing Authority of Jacksonville, which is not an agency of the city of Jacksonville but is a corporation created under statute and vested with broad powers, is not exempt from taxation under the Constitution as held and used exclusively for a ‘municipal purpose.’ ”
 

 In the course of its opinion, at page 553, the court says:
 

 “If this housing project property was owned by the city of Jacksonville, it
 
 might
 
 possibly be contunded with more plausibility that it should be held exempt on the ground that it was used for a public purpose. But where, as here, the property is not owned by the city, the title and control of same being vested in the Housing Authority, a distinct entity, the authorities above cited require us to hold that the property here involved is not exempt from taxation under the quoted provisions of our Constitution. The Constitution expressly designates what property of corporations shall be exempt from taxation and of course the Legislature is not empowered to add to or subtract from the clear and positive provisions of Section 16 of Article XVI of the Constitution.
 

 ‘ ‘ The cases above cited are not in Conflict with those cases which hold that the ownership and operation by a municipality of public libraries, public parks and playgrounds, public golf courses, and swimming pools,
 
 *31
 
 the benefits of which are to be enjoyed by the public generally, may constitute a legitimate municipal purpose within the meaning of the Constitution, but here we are dealing with a housing project, not owned or operated by the municipality, which is, or is to be. built and operated by a corporation for the benefit of a particular class, a low-income group to be selected by the corporation — the Housing Authority — and to whom the houses are to be rented at a reasonable rental price as determined by the Housing Authority.”
 

 The property of the appellant, according to the record, is to be leased to occupants for a rental sufficient only to pay costs without profit, and the tax exemption of such property would therefore inure directly to the interest of the tenants who, as a class, would receive a benefit not enjoyed by the public generally.
 

 The removal of slum districts in cities or elsewhere is greatly to be desired. So, also, would the improvement of living conditions of persons who through adverse circumstances live under squalid conditions. There are many homes which lack modern conveniences and modern sanitary facilities. The improvement of these homes and the removal of unsatisfactory living conditions in connection therewith would be most desirable and would be a great public benefit, but it certainly cannot be said that the improvement or rebuild - ing of such homes would make them buildings “used exclusively for public purpose” as they must be before they are entitled to exemption from taxation under our statutes as authorized by our Constitution. If, as in the case at bar, the legal title to such properties should be vested in some trustee for management, it would not in any way affect the actual use of the property.
 

 Tt is not contemplated that the houses built by appellant will be used for public purposes, as that term is used in the statute. On the contrary, they are or
 
 *32
 
 will be rented to private persons at a rental less than the average market value for such facilities. Each tenant will be assigned to his respective space giving him a private property interest therein and from which he may exclude or eject all other persons, including the public generally. Stripped of all fiction, the appellant was created by the state in the sense that the state gave its permission or license to a private corporation without profit, in- that it has no shareholders, to engage in a proprietary business, the primary object of which is the construction and operation of tenements for persons of low income, and as incidental thereto, the indirect reduction of slums insofar as such result may occur through the removal of tenants from slum areas.
 

 The appellant operates wholly on borrowed capital. The state of Ohio has no investment, interest or responsibility in the property or business of the appellant, and retains only a very limited right of supervision and inspection over its affairs. The only incidental interest the state can have in the whole project is limited to the indirect and incidental effect on slum clearance, which is in itself a legitimate function and one in which the state may engage. In this respect it differs from the function of the State Bridge Authority which has to do with the maintenance of bridges as a part of the public highways, and is, therefore, engaged in a public purpose.
 

 In short, this authority is only a device to accept the generosity of the federal government in loaning to such authority 90 per cent of the cost of the new property, which generosity is eagerly sought by communities where the money will be spent, with such incidental benefits as will come to any community where more and better tenements are provided. The appellant is the trustee through which the enterprise is carried on. In so operating, it is acting in a proprietary capacity and
 
 *33
 
 should not be granted a special privilege and preference which disrupts the-constitutional requirement of equality of tax burden. Section 2, Article XII of the Constitution.
 

 The situation brought about by the tax exemption of such projects becomes more or less alarming when it is considered that there are already similar projects in this state covering large ground areas where not only the value of the former buildings but the value of the ground areas themselves is lost as a source of public revenue.
 

 The private homeowner whose property is located on the opposite side of the street from the property of the appellant authority should not be penalized in the support of his government by increased taxes upon his property to make good the loss of public revenues resulting from the tax exemption of the property of the authority, unless the people of the state, through constitutional or legislative enactment, clearly adopt a policy which makes such discrimination possible. This is a subject for legislative and not judicial action. In the opinion of the court is has not been accomplished by the general tax exemption statutes.
 

 The decision of the Board of Tax Appeals is affirmed.
 

 Decision affirmed.
 

 Weygandt, C. J., Matthias, Bell and Turner, JJ., concur.
 

 Zimmerman and Williams, JJ., dissent.