Taft, J.
This cause has been submitted to this court on the demurrer of the relator to the answer of respondents. Since the demurrer searches the record, if no cause of action is stated in the petition, then a judgment will be required dismissing the petition. The judgment to be rendered will therefore depend upon whether the petition states a cause of action, and, *20 if it does, whether the answer alleges facts which constitute a defense to that cause of action.
The intervening petitioners contend that this “action * * * is at best an amicable action * * * and * * * the prior acts of * * * respondents in relation to the subject matter * * * have been such that they have no legal right to question the validity or constitutionality of the acts to compel which * * * relator seeks a writ of mandamus.” There is.much merit to their argument in support of this contention.
A practice has arisen of bringing before this court “amicable” actions of this nature involving a bona fide justiciable controversy; and that practice has resulted in the giving by this court of what are in reality merely advisory opinions. Usually, the right to maintain such amicable actions has not been questioned, although this court has warned as to the weight that should be given to decisions in such cases as precedents. See State, ex rel. Gordon, City Atty., v. Rhodes, Mayor, 158 Ohio St., 129, 107 N. E. (2d), 206.
However, the right to seek such advisory opinions from this court in such a manner was raised and considered by this court in State, ex rel. State Bridge Commission, v. Griffith, Secy, of State, 136 Ohio St., 334, 25 N. E. (2d), 847, where this court pointed out that the respondent Secretary of State in that case clearly had no interest in the controversy but observed in the opinion “by the court,” concurred in by six-judges :
“However, where a question of general public interest is raised, some courts have taken the view that an officer may make such a defense in a mandamus suit, even where there is some doubt that the respondent has any rights in the matter.”
After that observation this court, in that opinion, thereafter considered and passed upon the constitutional questions raised by the Secretary of State.
*21 Admittedly, the questions raised by the respondents in the instant case are of general public interest. Therefore, unless the court is to depart from the practice which it has followed in the past in cases of this kind even where the question has been raised, a dismissal of the action would appear to be inappropriate. It may be observed that a decision, in effect giving an advisory opinion, would be warranted more in the instant case than in many of the previous cases where this court has in effect been called upon to give such an opinion, by reason of the fact that intervention was allowed on behalf of property owners who opposed the action which the petition sought to require of the respondents.
The principal contention of respondents and of the intervening petitioners is that urban redevelopment is not a public use or purpose for which public funds can be expended and the power of eminent domain exercised.
It is apparently conceded by all parties that, if urban redevelopment is a public use or purpose for which the power of eminent domain may be exercised, then it is a use or purpose for which public funds may be expended. With respect to this contention of respondents and intervening petitioners, we shall, therefore, limit ourselves largely to a consideration of whether such power of eminent domain may be exercised.'
In support of this contention respondents state in their answer (substantially the same statements are found in the petition of the intervening petitioners) that the redevelopment plan involved “contemplates the acquisition by the city, through the power of eminent domain, of all the property in the redevelopment area for the purpose of reselling said property to private developers for their private purposes and profit after the city has first demolished the buildings *22 thereon”; and “that the acquisition of property for such purpose is not a public use and purpose for which the power of eminent domain can be exercised and public money expended and” would involve a violation of “Section 19 of Article I of the Constitution of * * * Ohio and the Fourteenth Amendment of the Constitution of the United States.”
Whether the plan does or does not “contemplate” such a “purpose” depends upon an interpretation of the ordinances and of the loan and grant contract involved. By reason of the incorporation of those ordinances and that contract in the petition and the admissions in the answer of respondents and the agreed statement of facts, their provisions are not in controversy.
An examination of those ordinances and of that contract clearly discloses that the redevelopment of this area contemplates the acquisition by the city, either by purchase or through the exercise of the right of eminent domain, of the property located in the area, the elimination of slum conditions in the area by clearing therefrom the buildings and making the land available for redevelopment, and the subsequent sale of the land for redevelopment with restrictions as to its use which will insure against recurrence of any slum or other conditions of blight; and discloses that the primary purpose of the redevelopment of this area is to eliminate the slum conditions and other conditions of blight and provide against their recurrence.
The validity of urban redevelopment projects similar to the project involved in the instant case has been uniformly sustained by the courts of last resort in other states. Opinion of the Justices (1950), 254 Ala., 343, 48 So. (2d), 757; Rowe v. Housing Authority (Ark. 1952), 249 S. W. (2d), 551; Zurn v. City of Chicago (1945), 389 Ill., 114, 59 N. E. (2d), 18; Chicago Land Clearance Comm. v. White (1952), 411 Ill., 310, 104 N. E. (2d), 236; In re Slum Clearance (1951), 331 *23 Mich., 714, 50 N. W. (2d), 340; Murray v. La Guardia, Mayor (1943), 291 N. Y., 320, 52 N. E. (2d), 884, certiorari denied, 321 U. S., 771; Belovsky v. Redevelopment Authority (1947), 357 Pa., 329, 54 A. (2d), 277, 172 A. L. R., 953; Schenck v. Pittsburgh (1950), 364 Pa., 31, 70 A. (2d), 612; Opinion to the Governor (1949), 76 R. I., 249, 69 A. (2d), 531; Ajootian v. Providence Redevelopment Agency (R. I. 1952), 91 A. (2d), 21; Nashville Housing Authority v. City of Nashville (1951), 192 Tenn., 103, 237 S. W. (2d), 946. See, also, annotations, 130 A. L. R., 1069, and 172 A. L. R., 966.
Only one court of last resort has held to the contrary. Adams v. Housing Authority of City of Daytona Beach (Fla.), 60 So. (2d), 663.
The exercise of the right of eminent domain under such a .project, carried out pursuant to state law, has likewise been held by the Supreme Court of the United States as not to be contrary to the Fourteenth Amendment to the federal Constitution. Burt v. City of Pittsburgh, 340 U. S., 802, 95 L. Ed., 589, 19 U. S. Law Week, 3057.
However, even if the great weight of authority, outside Ohio were in accordance with the Florida Supreme Court decision, we believe that a proper construction of the Ohio Constitution and previous decisions of this court and of the applicable limitations in the federal Constitution, as construed by the United States Supreme Court, require a decision that urban redevelopment, such as involved in the instant case, involves a purpose for which public funds can be expended and the power of eminent domain exercised.
The fallacy of the position of respondents and the intervening petitioners, in contending otherwise, arises largely from their misconstruction of the provisions of Section 19 of Article I .of the Ohio Constitution, which reads:
“Private property shall ever be held inviolate but subservient to the public welfare. When taken in time *24 of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money: and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.”
Their argument is (1) that in order to be a public use, there must be a use or right of use on the part of the public or some limited portion thereof, (2) that, on the completion of the redevelopment project here involved, no such use will be involved, and (3) that, by reason of the provisions of Section 19, Article I of the Ohio Constitution, private property may be taken under the right of eminent domain only for such a use.
We agree with them that one of the purposes of a constitution is to curb government power, that the words in a constitution should not mean one thing at one time and another at a subsequent time, and that a court should not by interpretation change the clear and unmistakable meaning of a constitutional provision because it believes public opinion desires such a change. Constitutions should be amended by those who have the power to amend them and not by the courts.
We further agree that it is an elementary rule of construction that words or phrases used in constitutions or statutes should be given their ordinary meaning, unless something in the context indicates a different meaning. However, there is, in the text of Section 19 of Article 1 of the Constitution of Ohio, something which indicates that the phrase “for public use” in that section should have a meaning other than the restricted meaning which respondents and the intervening petitioners claim should be given to it. In our opinion, to give to those words in that section the re *25 stricted meaning, which respondents and intervening petitioners advocate, would be to amend the section by judicial action.
Respondents and intervening petitioners disregard entirely the first sentence of that section of the Constitution, which is the very provision of the section that limits the 'purpose for which the power of eminent domain may be exercised. The remainder of the section merely deals with what compensation must be paid (i. e., in money), the time such compensation must be paid or secured, and how that compensation must be assessed. See Giesy v. Cincinnati, Wilmington & Zanesville Rd. Co., 4 Ohio St., 308, 329.
The corresponding provision of the Constitution of 1802 (Section 4, Article VIII) was silent with respect to these limitations as to when compensation was to be paid or secured and how it was to be assessed. See Pittsburgh, Cleveland & Toledo Rd. Co. v. Tod, 72 Ohio St., 156, 162, 74 N. E., 172; Kramer v. Cleveland & Pittsburgh Rd. Co., 5 Ohio St., 140, 145; Malone v. City of Toledo, 34 Ohio St., 541, 550. That section read:
“Private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation in money be made to the owner. ’ ’
It is apparent therefore that, under the Constitution of 1802, the power of eminent domain could be exercised to take private property for the public welfare. Ferris v. Bramble, 5 Ohio St., 109. By adding limitations with respect to when compensation should be paid or secured and how it should be assessed, the people in 1851 did not express any intention to limit further the .purpose for which the power could be exercised. Instead, when they then used the phrase “for public use” in adding the provisions as to when compensation is to be paid or secured and how assessed, they apparently intended that phrase to mean the same as if it had read “for the public welfare.” In *26 other words, in that section of the Constitution, they regarded property taken for “the public welfare” as property * ‘ taken for public use. ’ ’
This conclusion is fortified by the fact that the only two purposes for the establishment of the Constitution set forth in its preamble were to secure the blessings of our freedom “and promote our common welfare.”
The contention of respondents, that Section 19 of Article I of the Ohio Constitution prohibits the exercise of the right of eminent domain where there will ultimately be no use or right of use of the property taken on the part of the public or some limited portion of the public, is supported by paragraph three of the syllabus and some of the language of the opinion in Pontiac Improvement Co. v. Board of Commissioners, 104 Ohio St., 447, 135 N. E., 635, 23 A. L. R., 866. However, the decision in that case could rest either upon the statement of law set forth in the first paragraph of the syllabus or that in the second paragraph of the syllabus. So far as the third paragraph of the syllabus supports the foregoing contention of respondents, it appears to be contrary to the intention expressed by the people by the words used in Section 19 of Article I of the Constitution find inconsistent with other pronouncements of this court. See, for example, State, ex rel. Shafer, v. Otter, County Surveyor, 106 Ohio St., 415, 140 N. E., 399; Sessions v. Crunkilton, Treas., 20 Ohio St., 349, 356; Reeves v. Treasurer of Wood County, 8 Ohio St., 333; Shaver v. Starrett, 4 Ohio St., 495; Lake Erie & Western Rd. Co. v. Commissioners, 63 Ohio St., 23, 57 N. E., 1009; Chesbrough v. Commissioners, 37 Ohio St., 508, 516; Alma Coal Co. v. Cozad, Treas., 79 Ohio St., 348, 357, 87 N. E., 172, 20 L. R. A. (N. S.), 1092; Chicago & Erie Rd. Co. v. Keith, 67 Ohio St., 279, 288, 65 N. E., 1020, 60 L. R. A., 525.
The only other decisions of this court relied upon in support of the foreging contention of respondents are Dayton Metropolitan Housing Authority v. Evatt, *27 Tax Commr., 143 Ohio St., 10, 53 N. E. (2d), 896, 152 A. L. R., 223; Columbus Metropolitan Housing Authority v. Thatcher, 140 Ohio St., 38, 42 N. E. (2d), 437; Federal Public Housing Authority v. Guckenberger, Aud., 143 Ohio St., 251, 55 N. E. (2d), 265; and In re Application for Exemption from Taxation of Real Property, 155 Ohio St., 590, 99 N. E. (2d), 761. Each of those cases involved the question as to whether property, for which tax exemption was sought, could be said to be “used exclusively for any public purpose” within the meaning of Section 2 of Article XII of the Ohio Constitution. The word “exclusively” was emphasized in each of those decisions.
While the power of eminent domain may not be exercised merely or primarily to take private property for private purposes, there is no constitutional provision which limits the exercise of that power to a taking which will be exclusively for “the public welfare” or for public uses or for public purposes. If, therefore, the primary purpose for the exercise of the power is to acquire the property for ‘ ‘ the public welfare ’ ’ within the meaning of Section 19 of Article I of the Constitution, the power may be exercised even where there may be an incidental nonpublic use of the property or benefit from its taking. See, for example, Sessions v. Crunkilton, Treas., supra; Shaver v. Starrett, supra, 498; Chesbrough v. Commissioners, supra; Lake Erie & Western Rd. Co. v. Commissioners, supra, 27; Reeves v. Treasurer of Wood County, supra, 345, 346; State, ex rel. Shafer, v. Otter, County Surveyor, supra; City of Cleveland v. Wick, 18 Ohio St., 303; Pickering Hardware Co. v. City of Cincinnati, 149 Ohio St., 275, 78 N. E. (2d), 563.
As hereinbefore mentioned, the primary purpose of the redevelopment of this area is to eliminate the slum and other conditions of blight therein and provide against their recurrence.
We do not believe that anyone will seriously contend that the elimination of slum and other conditions *28 of blight and provisions against their recurrence would not be conducive to the public welfare and a public purpose, and that the use of property in doing that would not be a use for a public purpose. See State, ex rel. Ellis, City Solr., v. Sherrill, City Mgr., 136 Ohio St., 328, 25 N. E. (2d), 844; and Dayton Metropolitan Housing Authority v. Evatt, Tax Commr., supra, 31.
As recently stated by this court in paragraph two of the syllabus of State, ex rel. Gordon, City Atty., v. Rhodes, Mayor, 156 Ohio St., 81, 100 N. E. (2d), 225:
“The determination of what constitutes a public municipal purpose is primarily a function of the.legislative body of the municipality, subject to review by the courts, and such determination by the legislative body will not be overruled by the courts except in instances where that determination is manifestly arbitrary or unreasonable.”
Such elimination of slums and provisions against their recurrence in cities are certainly as conducive to the public welfare as is the elimination and prevention of those conditions which this court has consistently held sufficient to justify the taking of private property in ditch cases. See, for example, Reeves v. Treasurer of Wood County, supra, 345; Sessions v. Crunkilton, Treas., supra; Chesbrough v. Commissioners, supra.
In order to eliminate slums and provide against their recurrence in the redevelopment area, buildings must be demolished, land cleared and graded, and streets and utilities rearranged. During this process, any reasonable private use of any of the property in the redevelopment area would probably be impossible. In order to accomplish the primary purpose of eliminating slums and providing against their recurrence, the city must acquire, at least for a substantial period, complete dominion over and use of the area involved. Assuming that this could be accomplished by purchase or condemnation of less than a fee in the real estate in the area and that zoning regulations would then be *29 sufficient to protect against recurrence of slum conditions, the decision in Pontiac Improvement Co. v. Board of Commissioners, supra, demonstrates the tremendous complications which would be involved.
However, even if purchase or condemnation of the fee of the real estate in the slum area does involve acquisition of a greater interest in such real estate than actually necessary to accomplish the purpose of eliminating slum conditions and providing against their recurrence, such acquisition is now specifically authorized by Section 10 of Article XVIII of the Constitution, which reads in part:
“A municipality appropriating or otherwise acquiring property for public use may in furtherance of such public use appropriate or acquire an excess over that actually to be occupied by the improvement, and may sell such excess with such restrictions as shall be appropriate to preserve the improvement made.”
A question, as to whether the exercise by a municipality of this right to acquire by eminent domain more property than necessary for the public use or purpose for which it was sought involved a violation of the Fourteenth Amendment to the federal Constitution, was before the Supreme Court of the United States in Cincinnati v. Vester, 281 U. S., 439, 74 L. Ed., 950, 50 S. Ct., 360, but was not passed upon by that court in that case. More recent decisions of the Supreme Court of the United States convince us that the action of an Ohio city, involved in acquiring the fee of the real estate in a slum or blighted area under a redevelopment plan such as involved in the instant case, would be held a taking of property for a public purpose and not invalid under the Fourteenth Amendment or any other limitation in the Constitution of the United States. Thus in United States, ex rel. Tennessee Valley Authority, v. Welch, 327 U. S., 546, 90 L. Ed., 843, 66 S. Ct., 715, it is said in the court’s opinion, at pages 551 and 552, by Mr. Justice Black:
“The Circuit Court of Appeals * * * first analyzed *30 the facts by segregating the total problem into distinct parts and, thus, came to the conclusion that T. V. A.’s purpose in condemning the land in question was only one to reduce its liability arising from the destruction of the highway. The court held that use of the lands for that purpose is a ‘private’ and not a ‘public use’ or, at best, a ‘public use’ not authorized by the statute. We.are unable to agree with the reasoning and conclusion of the Circuit Court of Appeals.
“We think that it is the function of Congress to decide what type of taking is for a public use and that the agency authorized to do the taking may do so to the full extent of its statutory authority. United States v. Gettysburg Electric R. Co. 160 U. S., 668, 679. It is true that this court did say in Cincinnati v. Vester, 281 U. S., 439, 446, that ‘it is well established that in considering the application of the Fourteenth Amendment to cases of expropriation of private property, the question what is a public use is a judicial one. ’• But the court’s judgment in that case denied the power to condemn ‘excess’ property on the ground that the state law had not authorized it. And in Hairston v. Danville & Western R. Co., 208 U. S., 598, 607, this court, referring to the ‘rule’ later stated in the Vester case, said that ‘no case is recalled where this court has condemned as a violation of the Fourteenth Amendment a taking upheld by the state court as a taking for public uses in conformity with its laws.’ And see Madisonville Traction Co. v. Mining Co., 196 U. S., 239, 257, 260-261. But whatever may be the scope of the judicial power to determine what is a ‘public use’ in Fourteenth Amendment controversies, this court has said that when Congress has spoken on this subject ‘its decision is entitled to deference until it is shown to involve an impossibility.’ Old Dominion Co. v. United States, 269 U. S., 55, 66. Any departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of *31 their view on that question at the moment of decision, a practice which has proved impracticable in other fields. See Case v. Bowles, 327 U. S., 92, 101; United States v. New York, 326 U. S., 572. We hold that the T. Y. A. took the tracts here involved for a public purpose * * *.”
See, also, Burt v. City of Pittsburgh, supra.
This court in City of East Cleveland v. Nau, 124 Ohio St., 433, 179 N. E., 187, restricted the exercise of the power “to appropriate excess property in furtherance of a public use” to instances where the excess “was reasonably needed for that use.”
However, in the instant case, as hereinbefore mentioned, in order to eliminate slum conditions, it it necessary that buildings be demolished, land cleared and graded, and streets and utilities rearranged; during this process, any reasonable private use of the area will probably be impossible; and slum elimination will necessitate for a substantial period complete dominion by the city over and its use of the area. Also, restrictions on the use of the property, for the public purpose of preventing recurrence of slum conditions, may reasonably appear to offer a surer method of preventing such recurrence than any other method such as zoning. Under such circumstances, it is neither arbitrary nor unreasonable (see State, ex rel. Gordon, City Atty., v. Rhodes, Mayor [156 Ohio St.], supra) to say that the fee in the real estate in the area must be acquired as “reasonably needed” for (see City of East Cleveland v. Nau, supra) the primary purposes of slum clearance and the prevention of the recurrence of slums. Dingley v. City of Boston (1868), 100 Mass., 544.
It is contended by the intervening petitioners that the ordinances passed by the council are invalid because they do not comply with certain provisions of the state Urban Redevelopment Act. They and the respondents contend also that the state Urban Redevelopment Act is unconstitutional.
*32 This court has always recognized that the power of eminent domain is a sovereign power inherent in every government. See, for example, Giesy v. Cincinnati, Wilmington & Zanesville Rd. Co., supra; Kramer v. Cleveland & Pittsburgh Rd. Co., supra, 546; Covington & Cincinnati Bridge Co. v. Magruder, 63 Ohio St., 455, 475, 59 N. E., 216; Sargent v. City of Cincinnati, 110 Ohio St., 444, 451, 144 N. E., 132.
By Section 3 of Article XVIII of the Constitution, the people of Ohio conferred upon municipalities “authority to exercise all powers of local self-government.'” These powers necessarily include the power of eminent domain. Any doubt as to this is completely dispelled by the provisions of Sections 4 and 10 of Article XVIII, each of which purports to extend the authority of a municipality to exercise the power of eminent domain beyond such authority as would be included within the foregoing words of section 3 of that article.
Obviously, if a redevelopment project such as that in the instant case is within the lawful purposes of a government, then this redevelopment project is within the lawful purposes of- the local government of the city of Cincinnati. There is no provision of the Ohio Constitution which authorizes the interference by general laws with the exercise by a municipality of its power of eminent domain, such as the provisions of Section 3 of Article XVIII requiring that “local police, sanitary and other similar regulations” be “not in conflict with general laws ’ ’ and such as the provisions of Section 13 of Article XVIII authorizing the passage of laws limiting certain other powers of government otherwise vested in a municipality by section 3 of that article. Sanzere v. City of Cincinnati, 157 Ohio St., 515, 106 N. E. (2d), 286; State, ex rel. Gordon, City Atty., v. Rhodes, Mayor (156 Ohio St.), supra, 98; State, ex rel. Gordon, City Atty., v. Rhodes, Mayor (158 Ohio St.), supra, 133.
*33 It follows that the questions, whether the provisions of the Urban Redevelopment Act have been complied with and whether that act is constitutional, are not pertinent to a consideration of this case.
Whether the power of eminent domain was conferred on municipalities by Section 3 of Article XVIII was a question neither raised nor considered either in Emery v. City of Toledo, 121 Ohio St., 257, 167 N. E., 889, or Sargent v. City of Cincinnati, supra. Those decisions are not, therefore, entitled to any consideration as precedents on that question. State, ex rel. Gordon, City Atty., v. Rhodes, Mayor (158 Ohio St.), supra, 129.
The answer of respondents alleges that ten of the 331 buildings within the redevelopment area are not substandard buildings and that 3.7 per cent of the area constitutes vacant land. It does not follow that the area is not a slum area or that the acquisition of the buildings and vacant land referred to is not necessary in order to clear a slum area and prevent recurrence of the slum conditions in that area. See In re Edward J. Jeffries Homes Housing Project (1943), 306 Mich., 638, 11 N. W. (2d), 272; In re Housing Authority of Charlotte (1951), 233 N. C., 649, 65 S. E. (2d), 761; Stockus v. Boston Housing Authority (1939), 304 Mass., 507, 24 N. E. (2d), 333.
Intervening petitioners contend, and in their intervening petition allege, “that the redevelopment area in question does not constitute in fact a slum area or blighted area. ’ ’ There is no such allegation in the answer of respondents. In our opinion, if the intervening petitioners desire to make such a contention, which is contrary to the allegations of the petition and to the admissions made by respondents in their answer, this is not the proper proceeding in which to do so.
It is contended by respondents that the redevelopment project involves the lending of the city of Cincinnati’s credit to private persons contrary to the pro *34 visions of Section 6 of Article VIII of the Constitution of Ohio.
It is argued that the city is lending its credit to present owners of property in the area to be developed by paying for buildings which can be condemned under the police power. If the property to be appropriated is subject to condemnation under the police power because of its condition, such cloud upon its value should be reflected in its value. In order to compensate the owner for the value of such prbperty, the city should be required to pay no more than such value. There is, therefore, no lending by the city of its credit to present owners of property in the area.
It is further argued that the city is lending its credit to prospective purchasers of the redeveloped property by making site improvements contemplated by the redevelopment plan. To the extent that such site improvements do add to the value of the redeveloped property, the contribution of the city will be reflected in the value of the redeveloped property. It is not proposed to sell the redeveloped property for less than its value. On such sales, the city will recoup any amounts added to the value of such property by site improvements of the city. Cf. State, ex rel. Shafer, v. Otter, County Surveyor, supra; City of Cleveland v. Wick, supra; Pickering Hardware Co. v. City of Cincinnati, supra. The city will not, therefore, be lending its credit to prospective purchasers of such property.
Respondents contend that the loan and grant contract is invalid because it provides for the surrender of the city’s legislative power to a bureau of the federal government.
Thus, it is argued that the contract does not provide for any grant from the government unless the city undertakes to carry out the program of redevelopment in conformity with policies of the federal government. But, to the extent that a grant is not made, there *35 will be that much less to pay on the notes held by the government. The city is not obligated to pay any additional amount in the event that and because a grant by the federal government is not made. Furthermore, it is argued that the contract recognizes that the city has done certain things involving the enactment of legislation. However, no complaint is made that the city is obligated by the contract to continue to maintain such legislation and not change it. Also, it is argued that the city agrees to take all reasonable steps to remove or abrogate any restrictions on land in the project area based upon race, creed or color. However, it is not alleged that there are any such valid restrictions.
These arguments, made in support of this contention, are not persuasive. This court does not express any opinion on other arguments which might be made in support of, and does not pass upon other questions which may be involved in, this contention. See paragraph one of the syllabus in State, ex rel. Gordon, City Atty., v. Rhodes, Mayor (158 Ohio St.), supra.
Respondents contend that the notes in question constitute a debt. It should be apparent from a consideration of the admitted facts in the instant case and paragraph three of the syllabus in State, ex rel. Gordon, City Atty., v. Rhodes, Mayor (158 Ohio St.), supra, that there is no merit to this contention.
Neither respondents, nor intervening petitioners have, in their briefs, advanced any other contentions which would justify the conclusion that the demurrer to the answer of respondents should be overruled. It follows that the demurrer must be sustained.
Both parties agreed at the hearing that the ruling of the court on the demurrer will be dispositive of this cause unless such ruling is based upon the allegation of or failure to allege facts which might reasonably be supplied by amendments to the pleadings. Inasmuch as we do not believe the ruling on the demurrer *36 is so based, a peremptory writ of mandamus is allowed commanding respondents to execute project temporary loan note No. 1 as they have been directed to do by ordinances of the city.

Writ allowed.

Middleton, Hart, Zimmerman and Stevens, JJ., concur.
Weygandt, C. J., concurs in the judgment.
Matthias, J., dissents.